[No. B091046. Second Dist., Div. Five. Oct. 29, 1996.]

HYMAN PODOLSKY et al., Plaintiffs and Appellants, v.
FIRST HEALTHCARE CORPORATION, Defendant and Respondent.

**COUNSEL**

Bird, Marella, Boxer, Wolpert & Matz, Jason D. Kogan, Thomas R. Freeman, Bet Tzedek Legal Services and Eric M. Carlson for Plaintiffs and Appellants.

Hooper, Lundy & Bookman and Jay N. Hartz for Defendant and Respondent.

**OPINION**

**GODOY PEREZ, J.**—Plaintiffs Shirley Podolsky, Hyman Podolsky through his attorney in fact Shirley Podolsky, and Darlene Brozovich, on behalf of themselves and the general public, appeal from the summary judgment granted for defendant First Healthcare Corporation and the denial of their summary judgment motion. For the reasons set forth below, we reverse the summary judgment and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY[1]

Defendant and respondent First Healthcare Corporation (FHC or respondent) is licensed by the State of California to run a chain of 42 nursing homes for the elderly throughout the state.[2] Plaintiff and appellant Shirley Podolsky is the widow of plaintiff and appellant Hyman Podolsky. Hyman had lived in a nursing home since 1987 and was admitted to a Kaiser Permanente Hospital in July 1991 with pneumonia. Near the end of his two-week stay at Kaiser, Shirley Podolsky learned that her husband's nursing home would not take him back since he could no longer walk. After some searching, Shirley was able to find a nursing home with an available bed, the Hillhaven Healthcare Center in Van Nuys, which is owned by FHC.

Hyman Podolsky was taken from Kaiser to Hillhaven by ambulance on July 18, 1991. That morning, a Ms. Owens of Hillhaven handed Shirley Podolsky a stack of papers, stating they were "routine" and that Mrs. Podolsky would have to sign. Owens only described the services which Hillhaven would provide. Mrs. Podolsky had no chance to read the papers and was told to sign as soon as possible in order for her husband to remain at Hillhaven.

Owens placed check marks where Mrs. Podolsky was to sign, including a signature line which made her a "responsible party." The admission agreement stated that a responsible party jointly and severally assumed all liability for any charges incurred by a patient. Owens never explained what the term "responsible party" meant and Mrs. Podolsky believed it referred to the person who would be called in case of an emergency. Mrs. Podolsky said she "signed where Ms. Owens asked me to sign. I would've signed anything in order to make sure that my husband would have a safe place to stay. In addition, I wanted to return to my husband as soon as possible."

Mr. Podolsky was taken to a Kaiser hospital again on January 10, 1992, suffering from chest congestion. Upon his return to Hillhaven three days later, Hillhaven employee Lisa Meadows told Mrs. Podolsky to sign another stack of papers, explaining it was required whenever a patient was gone from the facility for more than seventy-two hours. Meadows gave Mrs. Podolsky

[1]In accord with the usual rules on appeal, we present the factual version most favorable to appellants, the parties who opposed summary judgment. (*Krongos* v. *Pacific Gas & Electric Co.* (1992) 7 Cal.App.4th 387, 390, fn. 1 [9 Cal.Rptr.2d 124].)

[2]FHC also manages two other nursing homes on behalf of other licensees.

Throughout this opinion, we will use the term "nursing home" as shorthand for skilled nursing or intermediate care facilities as defined by Health and Safety Code section 1250, long-term health care facilities as defined by Health and Safety Code section 1326, and skilled nursing facilities as defined by 42 United States Code section 1395i-3(a).

no real chance to read the papers and did not explain what they meant. Meadows placed an "X" in front of certain signature lines, including some where Mrs. Podolsky again signed as a responsible party. That term was not explained to her on this occasion either. Hyman Podolsky died at Hillhaven on September 23, 1992.

Plaintiff and appellant Darlene Brozovich is the daughter of Eunice Walker, who was admitted to a hospital after suffering a massive stroke in August 1990. When the hospital told Brozovich that her mother would be discharged in 10 days, Brozovich began to look for a nursing home since Walker was unable to care for herself. Only two nearby nursing homes had a bed available and Brozovich chose Hillhaven Hospital of Orange, which is also owned by FHC.

When Brozovich's mother was admitted to Hillhaven, the admissions director told Brozovich to sign a stack of admitting papers. Brozovich said the director "just told me to sign the various papers. I tried to ask questions, but the admitting director couldn't answer any of my questions. She just assured me that the papers were routine, and that Medicare would cover my mother's care." As with Shirley Podolsky, check marks were placed where the admissions person wanted Brozovich to sign, including provisions which made her a responsible party. The term was never explained to her and she did not know that it meant she was now liable for her mother's nursing home bills.

Declarations from the family members of other persons admitted to various FHC nursing homes tell similar tales regarding FHC's admissions process.[3] In April 1993, 74-year-old Geraldine Chase was forced to place her 45-year-old critically ill son in a nursing home when he was no longer able to care for himself. She chose the Hillhaven facility in San Francisco. Upon admission, a Hillhaven social worker named Esther told Chase she would have to sign some papers. Esther took Chase to a lounge, showed her a stack of papers, and told Chase where to sign after placing an "X" in front of various signature lines. When Chase said she wanted to read the papers, the social worker said she did not have to read them right then. Esther told Chase she would make copies which could be read later and said Chase should not worry about the papers. Because Esther seemed to be in a hurry, and because of the physical and emotional drain caused by her son's illness, Chase signed the documents, which seemed to her just a formality. Chase also believed she had no choice if her son were to stay at Hillhaven. When she got home, Chase became worried about what she signed and discovered she had signed as her son's responsible party.

---

[3] The persons giving these declarations are not parties to this action, however.

In June 1989, Hennili Falldorf was forced to place her mentally impaired mother in a nursing home since her mother was about to be released from the hospital. Under time pressure due to her mother's imminent release from the hospital, Falldorf settled on the Hillhaven nursing home in San Francisco. When her mother arrived there, Falldorf was asked to go to the office to sign some papers. She was given a stack consisting of at least 50 pages. The admissions counselor did not give her time to read the papers or to get advice and told Falldorf where to sign. Although she signed as a responsible party, Falldorf felt she had to in order to gain admission for her mother.

In April 1992, Martin Kroll was forced to find a new nursing home for his mother when she was unable to return to her previous nursing home following an extended hospital stay at the Kaiser hospital in Woodland Hills for heart problems. He settled on the Hillhaven nursing home in Van Nuys because it was the only one which had both an available bed and a contract with Kaiser hospitals. Admissions coordinator Lisa Meadows showed Kroll a whole stack of papers, which she described as "standard." Meadows flipped through them, directing Kroll to sign in certain locations where she had placed an "X." When Kroll questioned Meadows about the papers, she said they were all "legal and common." Meadows told Kroll he would have to sign as a responsible party in order to have his mother admitted.

Arlene Schweigl decided to place her father in a Hillhaven nursing home in June 1992 when his mental and physical condition deteriorated. When Schweigl's father was admitted, one of the nursing home's employees handed her a stack of papers which Schweigl had to sign. The employee did not explain what the papers meant, put an "X" where Schweigl was supposed to sign, and told her to sign where indicated. Schweigl signed as her father's responsible party even though no one explained what that term meant. She was "expected to sign everything 'one, two three' while . . . standing in the hallway; because [she] felt that [she] had no choice, that's exactly what [she] did." She ended up being billed for numerous items, from disposable razors and syringes to X-rays.

In November 1991, Gerald Tietz's mother, who was recovering from a stroke and a broken hip, was placed in FHC's Claremont Hillhaven nursing home. On the date of his mother's admission, the 62-year-old Tietz was himself recovering from heart bypass surgery and the removal of his gall bladder. The admissions coordinator, Lucille Gould, called Tietz to her office and placed a stack of papers in front of him. She told Tietz he would have to sign the papers but Tietz objected, since his mother was mentally competent. Gould said that according to the nursing home's procedures, his signature was necessary for his mother's admission. She said the papers did

not mean anything and were just a formality. Tietz did not read the stack of papers since it would take too long and Gould said she wanted him to sign right then. Because Tietz was tired and agitated, he signed where requested by Gould, but did note on the documents that he was not signing as a responsible party.

On December 9, 1992, Shirley Podolsky both individually and as her husband's personal representative, along with Brozovich, sued FHC on their own behalf and on behalf of the general public, contending that FHC's admission agreement and procedures were unfair and deceptive and violated or subverted several provisions of federal and state nursing home regulations.[4] Through both settlement and dismissal the complaint was eventually whittled down to one cause of action to enjoin FHC's allegedly unfair trade practices under Business and Professions Code section 17200. The only remaining basis for this claim was the allegation that the admission agreements, combined with FHC's admissions procedures, pressured and deceived family members of "private pay" patients (those paying with their own funds, not through government assistance programs) into cosigning as responsible parties in contravention of both federal and state law.[5]

Appellants and respondents filed cross-motions for summary judgment in August 1994. Both before and after those motions were filed, however, FHC made several revisions to its admission agreement and third party guarantee provisions. The third party guarantee at issue has been removed from the admission agreement and placed in a separate document. It will no longer be presented to Medicare or Medi-Cal patients, just those paying from their personal funds. Accordingly, the focus of the summary judgment motions and this appeal is on the new guarantee form which will be presented when admitting private pay patients.

The guarantee agreement now at issue is captioned:

---

[4]The Podolskys and Brozovich will sometimes be referred to collectively as appellants.

[5]The complaint originally contained causes of action under the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq., CLRA) and under Health and Safety Code section 1430, subdivision (b), which permits actions for injunctive relief for violations of certain state administrative nursing home regulations. The complaint was based not just on the alleged improper procurement of cosigners as responsible parties, but also alleged that FHC's admission agreement was contrary to state and federal nursing home regulations concerning the transfer and discharge of patients, readmission and bed-hold policies, and others. In addition to FHC, the complaint also named as defendants National Medical Enterprises, Inc., NME Properties, Inc., and NME Properties West, Inc. The exact relationship of those defendants to FHC is unclear from the record, but it appears they were affiliates, subsidiaries or parent corporations to each other. In any event, all defendants but FHC were dismissed and FHC is the only respondent on appeal.

"Agreement for Guarantee of Payment

Regarding Private Pay Residents"

It states that the guarantor personally guarantees payment to FHC for all care, supplies or services provided to the resident. The guarantor "acknowledges that he/she understands that he/she is not required, and cannot be required, to sign a Guarantee of payment as a condition of admission of Resident to Facility, or as a condition of Resident remaining in Facility." It also provides that the guarantor can terminate the agreement at any time by written notice, ending his obligation for any charges incurred after that time. The recited consideration for the guarantee is FHC's promise to send monthly copies of the resident's bill to the guarantor and to defer sending a notice of discharge to the resident until 15 days after a written notice of delinquency has been sent to the guarantor. Finally, the agreement concludes by stating in capital letters once more the guarantor's understanding that he is not required to sign the guarantee, that the guarantee cannot be required as a condition of admission or continued residence in an FHC facility, and that the guarantor should ask questions about the guarantee before signing it.

On October 31, 1994, the trial court denied appellants' summary judgment motion and granted summary judgment for FHC, finding that the proposed new guarantee agreement by its terms neither violated nor subverted federal or state law and was not deceptive.

## Standard of Review

■ Summary judgment is granted when a moving party establishes the right to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) In reviewing an order granting summary judgment, we must assume the role of the trial court and redetermine the merits of the motion. In doing so, we must strictly scrutinize the moving party's papers. (*Chevron U.S.A., Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 544, 549 [5 Cal.Rptr.2d 674].) The declarations of the party opposing summary judgment, however, are liberally construed to determine the existence of triable issues of fact. (*Sosinsky* v. *Grant* (1992) 6 Cal.App.4th 1548, 1556 [8 Cal.Rptr.2d 552].) All doubts as to whether any material, triable, issues of fact exist are to be resolved in favor of the party opposing summary judgment. (*Ibid.*)

While the appellate court must review a summary judgment motion by the same standards as the trial court, it must independently determine as a matter of law the construction and effect of the facts presented. (*Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1510-1511, 1513-1515 [285 Cal.Rptr. 385].)

Recent amendments to the summary judgment statute have changed the burden of proof. ■ A defendant moving for summary judgment meets his burden of proof of showing that a cause of action has no merit if that party shows that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to the action. (Code Civ. Proc., § 437c, subd. (o)(2).) Once the defendant does so, the burden shifts back to the plaintiff to show that a triable issue of one or more material facts exists as to that cause of action or defense. In doing so, the plaintiff cannot rely on the mere allegations or denial of his pleadings, "but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . ." (*Ibid.*; see *Union Bank* v. *Superior Court* (1995) 31 Cal.App.4th 573, 590 [37 Cal.Rptr.2d 653].)

DISCUSSION

### 1. *Federal and State Laws Regulating Nursing Homes*

Medicare is a federally funded health insurance program which pays certain health care costs for the elderly, including the cost of nursing homes. (42 U.S.C. § 1395 et seq.) Medicaid is a health care program for the poor, funded partly by the federal government and partly by the states. Medicaid also pays the cost of nursing home care for old persons. (42 U.S.C. § 1396 et seq.) In California, the Medicaid program is known as Medi-Cal. (Welf. & Inst. Code, § 14000 et seq.)

In 1987, Congress passed the Nursing Home Reform Act (the Reform Act) as part of the Omnibus Budget Reconciliation Act. (Pub.L. No. 100-203.) The Reform Act imposed several new requirements on nursing homes which participate in either the Medicare or Medicaid programs. Relevant here are provisions concerning both the solicitation of third party guarantees for a nursing home resident's bills and the procedures for discharging a resident who has not paid his bills.

Residents may be discharged for failure to pay their bills, but only after a two-step notification process is completed. First, the resident must receive "reasonable and appropriate notice[] to pay . . . ." (42 U.S.C. §§ 1395i-3(c)(2)(A)(v), 1396r(c)(2)(A)(v).) Second, before effecting the discharge, a predischarge notice must be sent both to the resident and a family member or legal representative at least 30 days before the discharge. (42 U.S.C. §§ 1395i-3(c)(2)(B)(i)(I), 1395i-3(c)(2)(B)(ii), 1396r(c)(2)(B)(i)(I), 1396r(c)(2)(B)(ii).) With respect to admissions practices, effective October 1, 1990, nursing homes must "not require a third party guarantee of payment to the facility as a condition of admission (or expedited admission) to, or

continued stay in, the facility. . . ." (42 U.S.C. §§ 1395i-3(c)(5)(A)(ii), 1396r(c)(5)(A)(ii).)

Relying on long-accepted rules of statutory construction, the legislative history of these enactments and their subsequent administrative interpretation by the Department of Health and Human Services (DHHS) make clear that they apply not just to Medicare and Medicaid recipients, but to so-called "private pay" nursing home residents, those who pay with their own funds. (See H.R. No. 100-391(II) 1987 U.S. Code Cong. & Admin. News, pp. 933-934 ["A [participating nursing home] would have to establish and maintain identical policies and practices regarding transfer, discharge and covered services for all individuals regardless of source of payment."]; 56 Fed.Reg. 48841 (Sept. 26, 1991) [based on statutory language, DHHS regulation implementing the ban on requiring third party guarantees "applies to all residents and prospective residents regardless of payment source in both Medicaid [nursing homes] and Medicare [nursing homes]"].)[6]

California has enacted a variety of laws regulating the conduct of nursing homes, both in general and in regard to the treatment of residents paying through Medi-Cal.

Health and Safety Code sections 1599-1599.4 establish a nursing home patient's bill of rights. "Written policies regarding the rights of patients shall be established and shall be made available to the patient, to any guardian, next of kin, sponsoring agency or representative payee, and to the public. . . ." (Health & Saf. Code, § 1599.1.) These procedures and policies shall ensure that each patient admitted has and is notified of a variety of rights relating to the quality of care provided. (Health & Saf. Code, § 1599.1, subds. (a)-(g).) The written information which informs a patient of his rights shall include, among others, a statement that further requirements are set forth in the Health and Safety Code and in title 22 of the California Code of Regulations. (Health & Saf. Code, § 1599.2, subd. (a).) Under title 22 of the California Code of Regulations, the patient and any representative shall be informed in writing of the patient's rights. These include the right to reasonable advance notice before the patient is discharged for nonpayment. (Cal. Code Regs., tit. 22, § 72527, subd. (a)(6).) A patient's representative

---

[6]Congressional intent may be found in the content of congressional reports on proposed legislation. In the absence of express congressional intent, the interpretation of a statute adopted by the federal agency charged with enforcing it is entitled to great deference. (*Chevron U.S.A.* v. *Natural Res. Def. Council* (1984) 467 U.S. 837, 842-844 [81 L.Ed.2d 694, 702-704, 104 S.Ct. 2778]; *Elizabeth Blackwell Health Center for Women* v. *Knoll* (3d Cir. 1995) 61 F.3d 170, 182; *Brothers* v. *First Leasing* (9th Cir. 1984) 724 F.2d 789, 792; *United States* v. *Curtis-Nevada Mines, Inc.* (9th Cir. 1980) 611 F.2d 1277, 1280, fn. 1.) Respondent does not dispute this interpretation of federal law.

may include a conservator, one designated by a durable health care power of attorney as the patient's attorney in fact, the patient's next of kin, or other appropriate surrogate decision maker. (Cal. Code Regs., tit. 22, § 72527, subd. (d).)

The form and content of admission agreements are governed by Health and Safety Code sections 1599.60-1599.84. The contract of admission is defined as all documents which a resident or his representative must sign at the time of or as a condition of admission. (Health & Saf. Code, § 1599.60, subd. (b).) "No contract of admission shall include any provision which the facility knows or should know to be deceptive or unlawful under state or federal law." (Health & Saf. Code, § 1599.62, subd. (a).) No contract of admission shall list any ground for involuntary discharge from the facility except those specifically enumerated by either state or federal law. (Health & Saf. Code, § 1599.76, subd. (a).) "All contracts of admission shall state that except in an emergency, no resident may be involuntarily transferred within or discharged from a long-term health care facility unless he or she is given reasonable notice in writing and transfer or discharge planning as required by law. The written notice shall state the reason for the transfer or discharge. . . ." (Health & Saf. Code, § 1599.78.)

Before or at the time of admission, the facility must make reasonable efforts to explain the contract to the resident and obtain his signature. Unless the resident is incompetent, he must sign or cosign the agreement. The facility is not precluded, however, "from obtaining the signature of an agent, *responsible party*, or a legal representative, if applicable." (Health & Saf. Code, § 1599.65, subd. (a), italics added.)

■ Welfare and Institutions Code section 14110.8, subdivision (a)(4) defines a responsible party as one other than the patient who signs or cosigns a nursing home admission agreement and agrees to assume personal liability for payment of the resident's bills. Given the similarity between this language and the legislative intent behind the federal ban on third party guarantees, we hold that a "responsible party" under California law is no different than a third party guarantor under federal Medicare and Medicaid law. (See 56 Fed.Reg. 48841 (Sept. 26, 1991), italics added [The federal prohibition against third party guarantees was designed to prevent nursing homes from "requiring a person, such as a relative, to *accept responsibility for the charges incurred by a resident.*" It prohibits such facilities from requiring a person other than the resident to "*assume personal responsibility for any cost of the resident's care.*"]; see also Ambrogi, *Legal Issues in Nursing Home Admissions* (1990) 18 Law Med. & Health Care 254, 258 [equating the terms "responsible party" and "guarantor" as one who signs or

cosigns a nursing home admission agreement and thus "assumes personal financial liability" for the resident's bills].)[7]

Under Welfare and Institutions Code section 14110.8, subdivision (b), nursing homes are prohibited from requiring or soliciting the signature of a responsible party as a condition of admission for a Medi-Cal beneficiary. If the nursing home is certified for Medi-Cal reimbursement, the contract must recite in bold capital letters the prohibition against requiring or soliciting a third party guarantee as a condition of admission found at Welfare and Institutions Code section 14110.8, subdivision (b). (Health & Saf. Code, § 1599.65, subd. (b).) The California statutes thus track the federal ban on such conduct found at 42 United States Code section 1396r(c)(5)(A)(ii).

Contrary to appellant's position, we do not believe that the solicitation of otherwise voluntary third party guarantors violates or subverts the terms of applicable federal or state law in and of itself. Neither federal nor state law prohibits nursing homes from voluntarily obtaining the signature of a willing responsible party or third party guarantor when admitting nursing home residents. Instead, the applicable statutes make it unlawful to require third party guarantees as a condition of admission or continued residence in such facilities. (42 U.S.C. §§ 1395i-3(c)(5)(A)(ii), 1396r(c)(5)(A)(ii); Welf. & Inst. Code, § 14110.8, subd. (b).) Had Congress intended to forbid third party guarantees under any circumstances, we presume it would have said so. State law, meanwhile, expressly states that the signature of third party guarantors may be obtained. (Health & Saf. Code, § 1599.65, subd. (a).) FHC's proposed guarantee agreement tracks these provisions by clearly stating in several places that execution of the guarantee is not required.[8] Instead, the issue is whether that solicitation is deceptive or not.

---

[7]As a result, we will use the terms "guarantor" and "third party guarantor" interchangeably with the term "responsible party."

[8]Since the solicitation of voluntary third party guarantees is not forbidden, FHC contends we should defer to the federal government in regulating this matter. Because the federal statutes at issue do not include a preemption clause and do not appear to occupy the field of nursing home regulation, application of the California Unfair Competition Act to enjoin unfair marketing practices is proper. (See *Solorzano* v. *Superior Court* (1992) 10 Cal.App.4th 1135,1146-1148 [13 Cal.Rptr.2d 161].) Also, as mentioned in footnote 12, *post,* both statutes expressly state that they do not prevent the use of other applicable state and federal remedies.

Further, as discussed *post,* it is possible the trier of fact could find that FHC in effect requires the signature of a third party guarantor, thus violating applicable state and federal statutes. Should the trier of fact determine that FHC does not in fact require a responsible party's signature, then the proposed guarantee agreement will not be considered part of the contract of admission and will not violate the applicable state and federal nursing home statutes. For the reasons set forth *post,* we nevertheless hold that the proposed guarantee agreement is deceptive.

## 2. *Actions for Unfair Trade Practices*

Under the Unfair Competition Act (UCA) found at Business and Professions Code section 17200 et seq., any unlawful, unfair or fraudulent business act or practice is deemed to be unfair competition. Business and Professions Code section 17200 defines unfair competition as including any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." Business and Professions Code section 17500 prohibits the use of any untrue or misleading statement in selling real or personal property or personal services. (Bus. & Prof. Code, § 17500; *People* v. *Dollar Rent-A-Car Systems, Inc.* (1989) 211 Cal.App.3d 119, 128 [259 Cal.Rptr. 191], hereafter *Dollar.*)

Injunctive relief and restitution are the remedies provided by the UCA. (*State Farm Fire & Casualty Co.* v. *Superior Court* (1996) 45 Cal.App.4th 1093, 1102 [53 Cal.Rptr.2d 229], hereafter *State Farm.*) It is not necessary to show the defendant intended to injure anyone since a violation of the UCA is a strict liability offense. (*Ibid.*) ■ Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." (45 Cal.App.4th at p. 1102.) Virtually any state, federal or local law can serve as the predicate for an action under Business and Professions Code section 17200. (45 Cal.App.4th at pp. 1102-1103.)

The independent "unfairness" prong of the UCA is "intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud. [Citation.] The test of whether a business practice is unfair 'involves an examination of [that practice's] impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . . [Citations.]' . . . ." (*State Farm, supra,* 45 Cal.App.4th at pp. 1103-1104.) An unfair business practice occurs when the practice " 'offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' [Citation.]" (*Id.* at p. 1104, quoting *People* v. *Casa Blanca Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530 [206 Cal.Rptr. 164, 55 A.L.R.4th 661].)

The "fraud" prong of Business and Professions Code section 17200 is unlike common law fraud or deception. A violation can be shown even if no

one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are likely to be deceived. (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660]; *State Farm, supra,* 45 Cal.App.4th at p. 1105.)

The court in *Dollar, supra,* 211 Cal.App.3d 119, affirmed a trial court judgment finding that a car rental company had violated the UCA in regard to the sale of collision damage waivers (CDW's) to its customers and in regard to repair charges billed to customers who damaged their rental cars.

The rental company offered CDW's to its customers for $3 to $11 per day. Its sales agents misrepresented the CDW as insurance or additional coverage which would protect the renter against liability if the car were damaged in an accident regardless of fault. Agents also misinformed customers that if they declined the CDW, they would only be liable for up to $500 in damages. In fact, the contract provided the renters would be absolutely liable for damages, the extent of which depended on whether the renter was at fault and if he had purchased a CDW. The CDW was not insurance and did not protect rental customers from liability caused by their own negligence. If a CDW was purchased, the customer waived his right to collect damages up to a specified amount in case of an accident which was not the renter's fault. A customer who did not buy a CDW was expected to pay for all damage to the car and the company's loss of use if the company concluded the renter was at fault. If the customer declined a CDW and was not at fault for damage to the car, the customer was still liable for as much as $2,500. Additionally, even though the company obtained car repairs at a greatly discounted rate, it charged customers for damage at a much higher retail rate without disclosing that fact.

The rental company revised its contract three times, eventually formulating one which stated that the CDW was not insurance, did not apply to damages from the customer's negligence, and that the customer was responsible for all such damages. The contract referred the customer to the back page for a further explanation of these terms. There, it stated that the customer would pay on demand the retail value of any repairs and for the company's loss of use.

The appellate court affirmed the judgment, finding substantial evidence to show a violation of the UCA. Statements by the company's employees that the CDW was insurance were both misleading and deceptive, the court held. The testimony of former customers, rental agents and the company's own executives demonstrated a history of false and misleading business practices

and training procedures which confused the car rental public about the protection offered by the CDW and tricked customers into buying CDW's under false pretenses. (*Dollar, supra,* 211 Cal.App.3d at p. 129.) As for the inflated repair charges, the company's "practice of charging its customers a higher 'retail repair rate' without explanation or substantiation is a deceptive business practice . . . ." (*Ibid.*) Even though the revised contract stated that customers would be charged the "retail value" of all repairs, the court held that language did not resolve the ambiguity. (*Ibid.*)

Appellants contend that FHC's proposed third party guarantee agreement for private pay residents violates the UCA on the following grounds: (1) because a guarantor signing such an agreement gets little more than federal law already provides, there is no consideration for the agreement. As such, it is unenforceable and violates the CLRA, which prohibits representing that a transaction confers or involves rights or remedies which it does not have. (Civ. Code, § 1770, subd. (n).); (2) it violates the CLRA's prohibition against the use of unconscionable provisions under Civil Code section 1770, subdivision (s); (3) solicitation of the third party guarantees is deceptive under the UCA because the agreement is unconscionable and because it subverts the federal prohibition against requiring third party guarantees for admission or continued stay in nursing homes which accept Medicare or Medi-Cal beneficiaries; and (4) it is deceptive under the UCA because family members will be misled into thinking their signature is required and because they will not read or understand what they are signing. We find the first and fourth arguments persuasive. As explained below, we hold that *Dollar*'s reasoning applies here, that the proposed agreement is deceptive, and that even if it were not, triable issues of fact exist as to whether FHC's proposed guarantee agreement violates the "unlawful" and "fraud" or "deception" prongs of the UCA.[9]

### 3. *The Proposed Agreement Is Deceptive*

■ Assuming for discussion's sake only that the monthly bills and 15-day notice of delinquency which FHC obligates itself to provide a third party guarantor before sending a notice of discharge for nonpayment are sufficient consideration to render the guarantee agreement enforceable, prospective guarantors may well find them of minimal value given the protections which they already enjoy under federal and state law. As we explain

---

[9]In so holding, we reject FHC's contention that the entire action has been rendered premature by its adoption of the new, proposed guarantee, since it has not yet been put to use. FHC's in-house lawyer has stated FHC's intent to use the proposed agreement and the UCA is properly invoked to enjoin proposed unfair business practices. (Bus. & Prof. Code, § 17203.) Because we reverse on these grounds, we need not consider whether the proposed guarantee violates the UCA because it is unconscionable.

below, the absence of any information about those protections renders the agreement potentially deceptive and we therefore hold that the proposed guarantee—by its own terms—violates the UCA.

We begin by stating the obvious—when a person enters a nursing home, it is usually their children or other close relatives who take part in the admissions process. FHC does not dispute this and does not contend that persons other than close family members are most likely to be solicited as third party guarantors. Under federal law, a resident's legal representative or an immediate family member are already entitled to receive a copy of the 30-day discharge notice. As noted, federal law also requires that the resident receive notice of nonpayment some time before a discharge notice is sent. Even though federal law does not entitle a third party guarantor to the notice of nonpayment which must precede the discharge notice, we presume that a mentally competent nursing home resident would in turn notify his third party guarantor after receiving the nonpayment notice. In the case of a mentally incompetent resident, however, all of the resident's rights devolve upon his state law representative. (42 U.S.C. §§ 1395i-3(c)(1)(C), 1396r(c)(1)(C).)

State nursing home regulations also impose a requirement that residents be given reasonable advance notice of any discharge. (Cal. Code Regs., tit. 22, § 72527, subd. (a)(6).) If that resident is incompetent, those rights devolve upon their representative, who can be a conservator, person designated in a durable power of health care attorney, or next of kin. (Cal. Code Regs., tit. 22, § 72527, subd. (d).) Again, it is most likely that a nursing home resident's third party guarantor will also be his or her next of kin or other qualified representative entitled to the resident's notification rights if the resident is mentally incompetent.

The net effect of these laws and regulations can be summarized as follows: While a third party guarantor is not entitled to the nonpayment notice which must by some unspecified reasonable time precede the 30-day discharge notice, common sense dictates that in most cases the guarantor will be the family member who will at least receive the 30-day notice. Further, in the case of mentally incompetent residents, federal and state nursing home regulations shift the resident's notification rights to the resident's conservator, next of kin or health care decision maker, again quite likely to be any third party guarantor. Thus, in many cases, the guarantor will definitely receive the 30-day discharge notice and is likely in many cases to also receive the federally-required notice of nonpayment which must precede it.

In exchange for assuming a liability which FHC itself estimates will average $2,000 a month, many third party guarantors will at most receive

only monthly bills and an additional 15 days' notice before the 30-day notice of discharge is sent.[10] In some instances, the guarantor will receive the predicate notice of nonpayment as well. This information is absent from FHC's proposed guarantee form, however.

We find this practice deceptive. While FHC argues that outlawing all third party guarantees will deprive consumers of their free choice in place of the dictates of consumer groups acting as self-appointed social engineers, their proposed guarantee lacks one element essential to make that choice truly free—knowledge of all the pertinent facts.

The primary consideration for the proposed guarantee is an extra 15 days' notice of delinquency before a discharge notice is sent. Anyone solicited to become a third party guarantor would want to know what kind of notice they would receive if they chose not to sign the guarantee. For someone who would not qualify for the automatic 30-day notice required under federal law or who was unlikely to receive the notice of nonpayment which must precede it, the bargain might seem worthwhile. For those who believed they were likely to receive one or both of the federally required notifications, assumption of a potentially large liability in exchange for regular monthly bills and notification which was no greater or only 15 days' greater than they could otherwise expect might well be considered a poor exchange.

In *Dollar*, the rental company's failure to notify customers they would be charged an inflated retail rate for repairs billed to the company at a discount was held deceptive, even when the contract stated repair charges were at the retail rate. (*Dollar, supra*, 211 Cal.App.3d at p. 129.) That reasoning applies with greater force here. While the proposed guarantee accurately and properly informs third party guarantors that their signature is not required, it does not inform them how little they might actually receive in exchange. Absent such information, family members of nursing home residents are likely to be deceived as.to the value of the consideration which underlies that agreement and will be unable to intelligently evaluate whether that bargain is worthwhile or not. To promote the free choice which FHC claims to protect, full disclosure must be given. Since the proposed guarantee does not provide this disclosure, the order granting summary judgment must be reversed.

---

[10]That the guarantor may terminate the guarantee agreement at any time makes no difference, since that termination is not retroactive and leaves the guarantor liable for all charges incurred to that point.

## 4. Triable Issues of Fact Exist as to Whether FHC's Proposed Guarantee Agreement Otherwise Violates the UCA

### A. Whether FHC Deceptively Induces or in Effect Requires Third Party Guarantees

While our reversal based on the deceptive nature of the proposed agreement itself might make it unnecessary to do so, we feel compelled to decide other issues raised by the parties both because they are of great importance to the parties and may avoid future litigation and also because they are of continuing public interest. (*Filipino Accountants' Assn.* v. *State Board of Accountancy* (1984) 155 Cal.App.3d 1023, 1030 [204 Cal.Rptr. 913].) The first such issue concerns the manner in which third party guarantee agreements are presented and explained to potential guarantors. ■ As explained below, even a properly worded guarantee agreement can violate the UCA if presented deceptively. In making its ruling, the trial court focused on the terms of the proposed new guarantee agreement and did not address appellants' declarations concerning FHC's presentation and explanation of a resident's admission documents to his family members. This oversight was error and mandates reversal.

We again note that admission of a close family member to a nursing home—usually by the child of a parent in declining mental or physical health—is often an emotionally-charged, stress-laden event. The declarations of appellants and their supporting witnesses depict close family members in times of great personal turmoil trying to find a suitable facility to care for an elderly parent, or, as in one instance, of an elderly parent forced to find a nursing home to care for a critically ill middle-aged child. While FHC attacks these as fallacious and unproven assumptions, such was clearly the case for the appellants and their witnesses. Though not always so, common sense dictates that it is often the case for others seeking care for their elderly and infirm parents or other relatives. (Accord, Ambrogi, *Legal Issues in Nursing Home Admissions*, *supra*, 18 Law Med. & Health Care 254, 255, 258, fn. omitted [choice of a nursing home is "often made in an atmosphere of stress and crisis in response to a precipitous deterioration in health status, disability level, or loss of a caregiver or spouse"; nursing homes almost always insist on dealing with a family member or responsible party as the principal or only signer of an admission agreement].)

Appellants' declarations, from several persons who admitted family members to various FHC nursing homes over a three-year period, portray an admissions process in which a stack of documents was hurriedly presented

with little or no explanation. Family members were simply directed where to sign, by "X" or check marks which had already been added by the FHC employee handling the admission process. In one case, the son of a newly admitted resident was expressly told that his signature as a responsible person was required. In all cases, the term was never explained. Even if FHC's proposed new guarantee were, by its terms, proper, appellants' evidence at least raises triable issues of fact as to how that document will be presented to the family members of persons admitted to FHC nursing homes throughout the state. If presented as appellants' supporting declarations suggest, it is likely to deceive consumers who will not be made aware of its provisions or who might be misled into believing their signature as a responsible party was required.

FHC's declarations contend that what happened to appellants and their witnesses was against company policy. Some of the offending employees have since left. Those who remain contradicted appellants' version of events. While this evidence challenges appellants' declarations, it does not as a matter of law refute them. Evidence still remains that FHC employees present FHC's admissions documents in a deceptive manner, leading to the inference that they will continue to do so in regard to the proposed new guarantee agreement.[11] If the failure of the car rental agents in *Dollar* to accurately inform customers that a collision damage waiver was not insurance and did not provide the expected coverage constituted a deceptive practice under the UCA, then the same can be said of FHC's admissions practices here.

FHC also contends that appellants' evidence does not establish a business practice, but merely several isolated instances of deceptive conduct. Business and Professions Code section 17200 was once applicable only to unlawful business practices, requiring proof of a pattern or course of conduct, not just a single transaction. (*State of California* ex rel. *Van de Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1169-1170 [252 Cal.Rptr. 221, 762 P.2d 385].) That section was amended in 1992, however, to state that it applies to any unlawful "*act* or practice," presumably permitting invocation of the UCA based on a single instance of unfair conduct. (Bus. & Prof. Code,

---

[11]Furthermore, these declarations were prepared more than one year before the summary judgment motions were heard and at a time when the proposed guarantee agreement now at issue had not even been formulated. FHC has produced absolutely no evidence as to how the new agreement will be presented to the family members of private pay residents. Two declarations submitted around the time of the summary judgment hearing by FHC's in-house lawyer charged with the task of drafting a new guarantee agreement simply state that the proposed new form will be offered at the time of admission but will not be required. This is insufficient to overcome the contrary inferences which can be drawn from appellants' evidence.

§ 17200, italics added; see Historical and Statutory Notes, 5 West's Ann. Bus. & Prof. Code (1996 pocket supp.) § 17200, p. 30.) Even under the prior version of Business and Professions Code section 17200, however, we believe that declarations from several persons who had virtually identical experiences when admitting family members to various FHC nursing homes over a three-year period is sufficient to at least raise an inference that such a pattern or course of conduct exists. Whether this is actually so is for the trier of fact to determine.

In addition to being deceptive or fraudulent under the UCA, should a trier of fact determine that FHC's admissions procedures in effect require the signature of a third party guarantor as a condition of admission, then FHC would also be in violation of the federal Reform Act, thereby violating the UCA's "unlawful" prong. Further, even though FHC says it will be presented as a separate document, the effect of such a finding would render the proposed guarantee part of the contract of admission. (Health & Saf. Code, § 1599.60, subd. (b) [contract of admission includes all documents which a resident or his representative must sign at the time of or as a condition of admission].) FHC would then also be liable under the UCA's "unlawful prong" for including a provision which violates federal law. (Health & Saf. Code, § 1599.62, subd. (a).)[12]

### B. *There Are Triable Issues Whether the Proposed Guarantee Lacks Consideration*

■ Under the CLRA, an agreement is unlawful if it represents "that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law." (Civ. Code, § 1770, subd. (n).) Appellants contend the proposed guarantee lacks consideration and therefore violates this provision since it purports to confer rights or obligations which it does not have.

The guarantee agreement recites two items as consideration for its execution: (1) the guarantor or responsible party will receive monthly bills listing

---

[12]FHC contends, without citation to authority, that its participation in the Medicare and Medicaid programs and the applicable provisions of 42 United States Code sections 1395i-3 and 1396r are tantamount to nothing more than a contract between FHC and the federal government which cannot be enjoined by appellants' state law UCA action. Taken at face value, we find this proposition dubious at best. Upon examination of the applicable federal statutes, it is belied by their terms. Any facility which fails to comply with the provisions of 42 United States Code sections 1395i-3 and 1396r may, among others, be assessed a civil money penalty. (42 U.S.C. §§ 1395i-3(h)(1), (2), 1396r(h)(1), (2).) Contrary to FHC's assertions, Congress's provision for such penalties makes these statutes something more than contractual in nature. Both statutes also expressly state that the remedies which they provide are in addition to those under state and federal law and shall not be construed as limiting such remedies, including those at common law. (42 U.S.C. §§ 1395i-3(h)(5), 1396r(h)(8).)

the expenses incurred by the resident; and (2) the guarantor will receive 15 days' written notice before any notice of discharge is sent to the resident. FHC contends that its promise to forebear enforcement of its discharge rights until the resident's responsible party is given 15 days' notice, combined with the duty to send monthly bills to the guarantor, is sufficient consideration to support the guarantee agreement.

When the recited consideration consists of nothing more than a preexisting obligation or duty, it cannot be consideration of a promise. (Civ. Code, § 1605 [consideration consists of "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled . . ."]; *Williams Constr. Co.* v. *Standard-Pacific Corp.* (1967) 254 Cal.App.2d 442, 453 [61 Cal.Rptr. 912].) We find that triable issues of fact remain regarding whether the proposed guarantee is based on nothing more than a preexisting legal obligation.

There is no evidence and no citation to authority concerning what constitutes the federally required "reasonable notice" of nonpayment which must precede the 30-day notice of discharge. If that notice equates with the 15 days provided by FHC's proposed guarantee, then FHC will have obligated itself to do nothing more than it is already legally required to do and the recited consideration would therefore be insufficient.

This argument applies with even greater force in the case of mentally incompetent nursing home residents. Under state and federal law, the legal rights of such persons devolve upon their representatives, persons who in many cases may well be solicited as third party guarantors. If the federally required reasonable notice of nonpayment which they will receive equates with the 15 days' notice promised as part of the third party guarantee, then the relatives of mentally incompetent nursing home residents who agree to become third party guarantors will receive nothing more than FHC is already obligated to provide under federal law.

Our discussion and holding in part 4.A. concerning the methods by which the guarantee agreements are presented and explained to potential guarantors also leads us to conclude that triable issues of fact exist whether there is consideration for the guarantees. First, consideration must be bargained for (see 1 Witkin, Summary of Cal. Law (9th ed. 1987) § 209, p. 218, and cases cited therein), and evidence that FHC deceptively induces people to act as guarantors raises triable issues whether real bargaining occurred. Second, the same facts raise triable issues whether the guarantee agreements violate state and federal law. If they do, then the consideration is unlawful. (Civ. Code, §§ 1607, 1608.)

Finally, we reject FHC's reliance on its promise to send monthly bills as consideration for a third party guarantee. While there are no reported decisions which consider this or similar situations, we hold that the delivery of monthly bills cannot serve as consideration for the underlying promise to pay those bills. Even if the monthly bills were adequate consideration, there is also no evidence and no citation to authority as to where FHC sends its bills in the case of mentally incompetent residents. If FHC is legally or contractually obligated to send those bills to persons likely to become third party guarantors, then for such guarantors those bills cannot serve as consideration for the proposed agreement.

## DISPOSITION

For the reasons set forth above, the summary judgment for FHC is reversed and the matter remanded to the trial court for further proceedings. For the guidance of the trial court upon remand, we point out that Business and Professions Code sections 17203 and 17535 authorize the court to "make such orders or judgments . . . as may be necessary to prevent the use or employment" of deceptive or unfair competition.[13] This remedial power is extraordinarily broad and has been construed to permit orders requiring the placement of prominent warning labels both to correct the consequences of past conduct and prevent future violations. (*Consumers Union of U.S., Inc.* v. *Alta-Dena Certified Dairy* (1992) 4 Cal.App.4th 963, 972-973 [6 Cal.Rptr.2d 193].)

With these powers in mind, we believe any future third party guarantee agreement submitted by FHC should fully, accurately and conspicuously set forth: (1) the notification rights and notification time periods available under federal and state law to both mentally competent and incompetent nursing home residents; (2) the notification rights and notification time periods available under state and federal law to a resident's family members or third party guarantor; and (3) that these rights exist even if no third party guarantee is signed. The third party guarantee agreement must also state, as it currently does, that such an agreement is not required as a condition of

[13]Business and Professions Code section 17203 states: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition . . . ."

Business and Professions Code section 17535 states: "Any person, [corporation or other entity] which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments . . . as may be necessary to prevent the use or employment . . . of any practices which violate this chapter . . . ."

admission to or continued stay in the nursing home. We also believe that a full and complete oral explanation of these matters should precede or accompany the presentation and solicitation of a third party guarantee and that a third party guaranty agreement should provide for the guarantor's signature acknowledging that such explanation has been made. The court and the parties might also consider allowing the solicitation of third party guarantees no sooner than one day *after* the admission agreement is signed to clearly separate the admission documents from the third party guarantee agreement. The trial court should consider these factors, along with points and authorities and oral argument from the parties, before entering any further judgment.

Appellants to recover their costs on appeal.

Grignon, Acting P. J., and Armstrong, J., concurred.