June McDERMOTT, Plaintiff,

v.

WESTERN UNION TELEGRAPH CO., Defendant.

Civ. No. S-88-0833 MLS.

United States District Court, E.D. California.

Aug. 29, 1990.

Jed Scully, Kathleen T. Friedrich, Community Legal Services, Sacramento, Cal., for plaintiff June McDermott.

William J. Coyne, Diepenbrock, Wulff, Plant & Hannegan, Sacramento, Cal., for defendant Western Union Telegraph Co.

## MEMORANDUM OF DECISION AND ORDER

MILTON L. SCHWARTZ, District Judge.

This removed diversity action is before the court on defendant's motion for summary judgment, or, alternatively, for summary adjudication of issues, and plaintiff's cross-motion for partial summary judgment.

The motions were heard on the court's regularly scheduled Motions Calendar of August 4, 1989, and, after supplemental briefing on jurisdictional issues, at a continued hearing on December 8, 1989. At the close of oral argument, the court took the motions under submission. It now renders its decision based on the presentations made at oral argument and all pleadings and papers filed by the parties.

## I. BACKGROUND

Plaintiff's son Kevin was stationed at the Naval Radio Transmission Station Facility at Capas in the Philippines, near Clark Air Force Base ("Clark AFB"). He met his fiance Yolanda in the Philippines, and had supported her since 1980. He was in the process of adopting Yolanda's three children when the events occurred out of which plaintiff's claims arise. On May 5, 1984, Kevin called plaintiff and asked her to send $1,000 to pay funeral expenses for Yolanda's daughter, Irene, who was sixteen.

Plaintiff alleges that she had seen a number of defendant's commercials on television prior to May 5 which said Western Union could deliver money to any of its 9,000 locations, usually within 15 minutes, and that Western Union was the fastest way to send money. Upon calling defendant, plaintiff says she explained that she needed to send money to her son who was stationed in the Philippines to help pay burial expenses. She was told she could charge the money on her VISA account, and that there was a charge of $45.95 for wiring the money. Plaintiff further alleges that she asked defendant's operator how long it would take for the money to arrive,

and that the operator said it would take 15 to 45 minutes, and a maximum of 24 hours.

Plaintiff states that she was very emotional on the phone, and that when she began to give the operator Kevin's address at the naval station, she lost control and could not talk any more. Consequently, plaintiff's daughter Judy completed the telephone conversation. Plaintiff alleges that Judy also told the operator the reason for wiring the money, asked how long it would take, and was told it would take 15 to 45 minutes, or 24 hours maximum. Judy then gave the operator Kevin's address. Plaintiff further alleges that Judy called defendant two more times to see if the money order had been sent, and was told that it had.

Kevin placed collect calls to his mother on May 9 and 10 to say that he had not received the money order she had wired. When plaintiff called defendant, she was told there was nothing defendant could do to track down the money order. Plaintiff then called the Red Cross at Mather Air Force Base, and Red Cross personnel arranged for the Red Cross at Clark AFB to give Kevin $1,000 after plaintiff had a check in that amount delivered to the Red Cross at Mather. Plaintiff covered the $1,000 check to the Red Cross with a cash advance on her VISA card. Kevin received the money from the Red Cross at Clark AFB on May 11.

Kevin received the Western Union money order on May 28 or 29. He took the money order to a bank at Clark AFB, where he endorsed it before discovering that it could only be cashed for pesos. He then endorsed the money order over to plaintiff, and sent it to her to cash.

Plaintiff alleges that she tried to obtain a refund from defendant, but was told that the amount she would receive as a refund would be based on the exchange rate in effect when the money order was received in the Philippines, which meant she would only receive $600–700. Plaintiff then tried to deposit the money order in her checking account, but her bank would not accept it.

During the time plaintiff tried to resolve her differences with defendant, she spoke

with several of defendant's employees. One, apparently without prompting, allegedly asked her if the delayed money order had been sent to the Philippines, and then told plaintiff she was lucky her son received the money order in a month or less, since it often took three or four months for money orders to reach people in the Philippines.

Plaintiff filed suit against defendant in state court on May 6, 1985, asserting twelve causes of action. After the case was filed, and approximately one year after plaintiff purchased the money order, defendant credited plaintiff's VISA account in the amount of $1,045.95. By this time, plaintiff had paid back the amount she had borrowed to purchase defendant's money order and the $1,050 cash advance to cover the check she had given to the Red Cross at Mather.

While this action was in state court, plaintiff amended her complaint. On February 27, 1987, the state court struck three of plaintiff's causes of action (Counts VIII, IX, and X). Defendant removed the action to this court on June 27, 1988, after Doe defendants were dismissed by the state court on June 14.

Plaintiff's first amended complaint now contains the following claims:

Count I   Breach of contract;

Count II   Intentional misrepresentation (operator);

Count III   Negligent misrepresentation (operator);

Count IV   Suppression of fact (operator);

Count V   Intentional misrepresentation (commercial);

Count VI   Negligent misrepresentation (commercial);

Count VII   Suppression of fact (commercial);

Count XI   Intentional infliction of emotional distress;

Count XII   Negligent infliction of emotional distress.

Defendant seeks summary judgment on all claims under a variety of theories. Plaintiff seeks summary judgment on Claims V, VI, and VII and a number of defendant's affirmative defenses. When the court heard these motions on August 4, 1989, it requested additional briefing on jurisdictional issues. After further hearing on December 8, the motions were taken under submission.

## II.   JURISDICTIONAL AND RELATED ISSUES

### A.   Jurisdiction

■ In conducting its own research prior to the August 4, 1989 hearing, several cases suggested that this court might lack jurisdiction to hear plaintiff's action. Consequently, the parties were asked to brief jurisdictional issues in light of *Ivy Broadcasting Company v. American Telephone & Telegraph Company,* 391 F.2d 486 (2d Cir.1968), and *Frenkel v. Western Union Telegraph Company,* 327 F.Supp. 954 (D.Md.1971). *Frenkel* suggested that tariffs limiting recovery for lost or delayed telegrams and money orders to $500 might be on file with the Federal Communications Commission ("FCC"). A limitation on liability would preclude this court from hearing plaintiff's claims because the jurisdictional limit for diversity cases was $10,000 when this action was removed to federal court.

In its supplemental brief, defendant informed the court that its tariff covering money transfer services was cancelled effective May 17, 1979, and that the FCC does not limit liability in cases where there have been delays or mistakes in transmitting international money orders. Thus, the jurisdictional problem found in *Frenkel* does not exist in this action.

Furthermore, in determining whether a matter in controversy exceeds the jurisdictional amount, the sum claimed in the complaint controls. *Powers v. Fultz,* 404 F.2d 50, 52 (7th Cir.1968); *see Davenport v. Mutual Benefit Health & Accident Association,* 325 F.2d 785, 787 (9th Cir.1963) ("[W]here the complaint asserts a claim in the jurisdictional amount, the action should not be dismissed unless the proof not only shows that the plaintiff cannot recover that amount, but also shows this with such certainty as to indicate a lack of good faith on

the part of the plaintiff in bringing the action in the federal court"). Plaintiff has alleged $1,250,000 in general damages and $2,500,000 in exemplary and punitive damages, amounts well above the jurisdictional limit. Because plaintiff initially filed this action in state court, it is apparent that she did not allege the damages she now asserts purely for jurisdictional purposes. Plaintiff did not exhibit a lack of good faith. Accordingly, the court may properly exercise its diversity jurisdiction.

### B. *Does State or Federal Law Apply?*

■ Congress enacted comprehensive legislation regulating common carriers engaged in interstate telegraph and telephone transmission by amendment of the Interstate Commerce Act in 1910, which brought communications carriers under the jurisdiction of the Interstate Commerce Commission. *Ivy Broadcasting*, 391 F.2d at 490. Jurisdiction was transferred to the FCC with enactment of the Communications Act of 1934, 47 U.S.C. §§ 151–609. *Id.* One of the purposes of the Communications Act was to make a rapid, efficient, nationwide and worldwide communications service with adequate facilities available to the people of the United States at reasonable prices. *Id.;* 47 U.S.C. § 151.

The Supreme Court, in a series of decisions, has held that the establishment of this broad scheme indicates Congress' intent to occupy the field to the exclusion of state law. *See, e.g., Western Union Telegraph Company v. Boegli*, 251 U.S. 315, 40 S.Ct. 167, 64 L.Ed. 281 (1920) (state law inapplicable on question of carrier's liability for negligence not specifically covered by tariff provisions); *Western Union Telegraph Company v. Speight*, 254 U.S. 17, 41 S.Ct. 11, 65 L.Ed. 104 (1920) (recovery for mental suffering resulting from defendant's negligence not available under federal law). As late as 1968, in discussing the series of Supreme Court cases, the Second Circuit stated:

> These cases lead us to conclude that questions concerning the duties, charges and liabilities of telegraph or telephone companies with respect to interstate communications service are to be governed solely by federal law and that the states are precluded from acting in this area. Where neither the Communications Act itself nor the tariffs filed pursuant to the Act deals with a particular question, the courts are to apply a uniform rule of federal common law.
>
> It seems reasonable that the congressional purpose of uniformity and equality of rates should be taken to imply uniformity and equality of service.... [T]he congressional purpose can be achieved only if a uniform federal law governs as to the standards of service which the carrier must provide and as to the extent of liability for failure to comply with such standards.

*Ivy Broadcasting*, 391 F.2d at 491.

Although Western Union no longer has tariffs covering money transfer services on file with the FCC, the parties in this action have not suggested that Congress has substantially amended the Communications Act. Therefore, although it appears as though the FCC may currently be declining to exercise the full scope of the jurisdiction granted to it by Congress, the court must assume, on the record before it, that Congress has not limited the broad scheme that it set in place for regulating communications carriers. Accordingly, the court concludes that it must apply federal law to plaintiff's action.

## III. SUMMARY JUDGMENT

### A. *Standard*

Summary judgment is proper where

> the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c).

■ A party seeking summary judgment always bears the initial responsibility of informing the court of the basis of its motion and identifying portions of the pleadings, depositions, answers to interrog-

atories, admissions, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of fact. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden on the moving party may be discharged by showing that there is an absence of evidence to support the nonmoving party's case. *Id.*, 477 U.S. at 325, 106 S.Ct. at 2554.

■ After adequate time for discovery, Rule 56 mandates the entry of summary judgment upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case when that party will bear the burden of proof at trial. *Id.*, 477 U.S. at 322, 106 S.Ct. at 2552. A court must accept the nonmoving party's version of the material facts, unless the nonmoving party fails to submit evidence supporting its version. *Lake Nacimiento Ranch Company v. San Luis Obispo County*, 841 F.2d 872, 875 (9th Cir.1987), *cert. denied*, 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988). The standard for granting summary judgment mirrors the standard for a directed verdict under Rule 50(a). *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552, *quoting Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

### B. *Defendant's Motion*
#### 1. Damage
##### a. *Economic Losses*

■ Defendant seeks summary judgment on Counts I through VII, contending that plaintiff sustained no damage as a result of delayed delivery of the money order. It cites the depositions of Kevin and Yolanda, in which they say that Yolanda's brother arranged credit for the funeral and burial expenses before Kevin asked his mother for funds. Defendant further contends that the funds plaintiff sent were not necessary in preparing the body for burial. Plaintiff, on the other hand, asserts that she suffered both economic losses and personal injury. Although she does not specify what her economic losses were, she asserts personal injury in the form of stress and concerns about high blood pressure. *See* Plaintiff's Opening Brief, Exhibit 1 (Plaintiff's Declaration at 3:7–13).

Damage is an essential element for breach of contract (Count I) and fraud-related claims (Counts II through VII). *See Lortz v. Connell*, 273 Cal.App.2d 286, 290, 78 Cal.Rptr. 6, 8 (1969) (contract); *Stone v. Foster*, 106 Cal.App.3d 334, 344, 164 Cal. Rptr. 901, 906 (1980) (tort).[1]

Although plaintiff alludes to economic injury suffered by Kevin and Yolanda, she lacks standing to assert those claims. The court concludes that, inasmuch as Kevin and Yolanda are not parties to this action, any economic injury they might have suffered is irrelevant. However, although she does not directly address actual economic losses she suffered, plaintiff has recounted several international telephone calls that appear to have been engendered by the delayed delivery of the money order. To the extent that these or other costs or expenses were incurred by plaintiff because of the delay, she has raised a triable issue of fact on the issue of whether she suffered economic losses. Therefore, defendant's motion for summary adjudication of this issue must be denied.

##### b. *Personal Injury*

■ Plaintiff contends that she suffered personal injury because of the delayed delivery. Although she argues in her papers

---

**1.** Although defendant aggressively argues that federal rather than state law applies in the present action, many of the cases it cites are California cases. In its supplemental briefing on jurisdiction, defendant explains this contradiction by stating:

> In its moving papers in support of its Motion for Summary Judgment, Western Union has cited both federal and state law. First,

Western Union has cited federal law on those specific issues where such law differs from California state law. Next, Western Union has cited California authorities for those general propositions of law for which state and federal law are in accord (e.g., that damages are an essential element of each cause of action).

Defendant's Supplemental Reply Brief at 3:5–12.

that "[i]t is well established that courts not only redress the pecuniary and tangible injuries, but they also intervene to redress non-pecuniary and intangible injuries," she cites no cases in support of this contention with respect to claims based on breach of contract or fraud-related claims. Plaintiff's Opposition Brief at 7:26–28. *Wainscott v. Occidental Building and Loan Association*, 98 Cal. 253, 33 P. 88 (1893), a case cited by plaintiff, is not to the contrary. In *Wainscott*, the court determined that a plaintiff had to prove *actual* damage before it could recover on a fraud claim.

Plaintiff further contends that she experienced stress and concerns about high blood pressure as a result of defendant's conduct. However, she has not submitted any evidence of physical manifestations of the alleged stress. Therefore, her allegations involving stress and concerns about high blood pressure are more appropriately dealt with under the separate claims she brings for intentional infliction of emotional distress (Count XI) and negligent infliction of emotional distress (Count XII). *See, e.g., Fuentes v. Perez*, 66 Cal.App.3d 163, 168–69, 136 Cal.Rptr. 275, 276–77 (1977) (discusses difference between physiological and psychological injury).

Plaintiff has failed to show that there is a triable issue of fact with respect to personal injury she allegedly suffered in connection with the claims she brings under Counts I through VII. Accordingly, the court concludes that it must grant defendant's motion for summary adjudication of this issue.

### 2. Fraud

■ Plaintiff asserts six fraud-based claims. In order to successfully prosecute a fraud-based claim, a plaintiff must show: 1) a misrepresentation; 2) knowledge by defendant of falsity; 3) intent to defraud or induce reliance; 4) justifiable reliance by plaintiff; and 5) resulting damage. *Stone v. Foster*, 106 Cal.App.3d at 344, 164 Cal. Rptr. at 906.

**2.** The court finds defendant's evidentiary objections inappropriate at this stage of the proceedings. Therefore, the objections are overruled

### a. Commercials (Counts V through VII)

■ Plaintiff brings three claims based on alleged misrepresentations made in defendant's television commercials (Counts V through VII). The commercials contained, among others, the following statement: "To send someone money fast come to Western Union. We'll make sure it gets to any of our 9,000 locations, usually in 15 minutes or less." Plaintiff's Exhibit 2.[2]

Plaintiff contends that this statement is false, and that it was made with the intent to induce her to enter into a contract. Plaintiff's Opposition Brief at 8:14–20, 9:5–7. However, she has introduced no evidence showing that the statement is false. Defendant has stated, and plaintiff has failed to refute, that it does not have an office in the Philippines. As defendant points out, no reasonable person seeing the commercial could infer that defendant can deliver money to any person any place in the world within 15 minutes.

Plaintiff has failed to establish that there is a triable issue of fact on an essential element of her claims involving defendant's commercials. Therefore, the court will be granting defendant's motion for summary judgment on Counts V through VII.

### b. Operators
#### 1) Intentional Misrepresentation (Count II)

■ Defendant argues that plaintiff cannot show that it had an intent to deceive. Although it is difficult to understand plaintiff's argument on this issue, she appears to be saying that defendant provides a manual for its operators which includes information and standardized replies to questions about sending credit card money orders. When a money order is being sent to a specific destination and the sender asks when it will be ready for payment, the manual directs the operator to say that the money order can usually be picked up within two hours. Plaintiff's Opening Brief,

without prejudice to defendant's right to renew them at a later date.

Exhibit 3. The manual says that credit card money orders can be sent to the Philippines via RCA, and orders for payment at places other than Manila are sent by telegraph to Manila and forwarded from there by Philippine mail. *Id.*

Plaintiff seems to be arguing that the operator with whom she and her daughter Judy spoke had, at a minimum, constructive knowledge of the actual procedures defendant used for sending money orders to the Philippines. Therefore, the information the operator gave to plaintiff and Judy regarding the amount of time it would take to deliver the money order was false; the operator knew, or should have known, it was false; and the operator gave plaintiff the false information with the intent to induce plaintiff to enter into the contract and/or to rely on the misrepresentation. Plaintiff's statement that many of defendant's employees with whom she spoke knew about delayed delivery of money orders to the Philippines supports this theory.

Plaintiff has carried her burden of establishing that there are triable issues of fact with respect to her claim of intentional misrepresentation by defendant's operator. Therefore, defendant's motion for summary judgment on Count II will be denied.

2) Suppression of Fact (Count IV)

■ Defendant first argues that failure to disclose material facts is not actionable fraud unless there is a fiduciary relationship giving rise to a duty to disclose. Although plaintiff argues that she and defendant had a confidential relationship because she reposed her trust and confidence in defendant, entrusting money to defendant to deliver to her son, the relationship does not demonstrate the kind of special circumstances that existed in the cases cited by plaintiff in which such a duty to disclose arose. *See, e.g., California–Calaveras Mining Company v. Walls,* 170 Cal. 285, 149 P. 595 (1915) (promoter of a corporation); *Stevens v. Marco,* 147 Cal. App.2d 357, 305 P.2d 669 (1956) (partner/"joint venturer"); *Scafidi v. Western Loan & Building Company,* 72 Cal.App.2d 550, 165 P.2d 260 (1946) (holder of contractor's first mortgages had no duty to dis-

close information to holders of contractor's second mortgages). The relationship between plaintiff and defendant is more in the nature of an arms-length transaction in which plaintiff bargained for defendant's promise to transmit a certain sum of money to her son.

■ Alternatively, plaintiff contends that even if defendant initially had no duty to speak, once it did speak, it was required to tell the whole truth. In *Bank of America National Trust & Savings Association v. Hutchinson,* 212 Cal.App.2d 142, 27 Cal. Rptr. 787 (1963), the court described the requirement to give all material facts as follows:

> " 'Even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated. If he speaks at all he must make a full and fair disclosure.' Where there is a duty to disclose, the disclosure must be full and complete, and any material concealment or misrepresentation will amount to fraud sufficient to entitle the party injured thereby to an action."

*Id.,* 212 Cal.App.2d at 148, 27 Cal.Rptr. at 790 (citations omitted), *quoting Pashley v. Pacific Electric Railway Company,* 25 Cal.2d 226, 235, 153 P.2d 325 (1944); *see also American Trust Company v. California Western States Life Insurance Company,* 15 Cal.2d 42, 65, 98 P.2d 497 (1940) ("Regardless of whether one is under a duty to speak or disclose facts, one who does speak must speak the whole truth, and not by partial suppression or concealment make the utterance untruthful and misleading").

Defendant's operator had material information available to her regarding defendant's method of delivering money orders in the Philippines. Plaintiff says she was not told that money orders were sent by Philippine mail once they reached Manila. She also says that if she had known about defendant's method of delivery, she would

**1024**

have sought some other means of sending money to her son.

Plaintiff has established that there is a triable issue on the question of whether defendant suppressed facts. Therefore, the court will be denying defendant's motion on Count IV.

### 3) Emotional Distress (Counts XI and XII)

 Defendant has cited a number of cases in support of its contention that federal common law applies to claims against communications carriers, and that claims for infliction of emotional distress are not cognizable under federal common law. *See, e.g., Speight,* 254 U.S. 17, 41 S.Ct. 11, 65 L.Ed. 104 (1920); *Frenkel,* 327 F.Supp. 954 (D.Md.1971). Plaintiff, on the other hand, discusses the evolution of state common law and points out that various states now recognize claims for emotional distress. However, she fails to cite a single case showing that claims for emotional distress are cognizable under federal common law.

Defendant has carried its burden of showing that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(b). Therefore, the court will be granting defendant's motion for summary judgment as to Counts XI and XII.

### C. Plaintiff's Motion

#### 1. Commercials (Counts V through VII)

Plaintiff has failed to show that defendant's television commercials were false. Therefore, the court must deny her motion for summary judgment on Counts V through VII.

#### 2. Affirmative Defenses

Plaintiff also moves for summary judgment on defendant's affirmative defenses of estoppel, statute of limitations, laches and unclean hands, waiver, and contributory negligence. Inasmuch as defendant has raised legitimate questions about the effect of plaintiff's conduct on any damages she might have sustained, the court will be denying plaintiff's motion as to defendant's affirmative defenses.

Accordingly, IT IS ORDERED:

1. That defendant's motion for summary adjudication on the issue of damage is DENIED with respect to economic losses and GRANTED with respect to personal injury;

2. That defendant's motion for summary judgment is GRANTED as to Counts V through VII and DENIED as to Counts II and IV;

3. That plaintiff's motion for summary judgment on Counts V through VII and on defendant's affirmative defenses is DENIED; and

4. That the final pretrial conference is rescheduled for February 22, 1991 at 2:00 p.m., and that the trial date of November 5, 1990 at 10:00 a.m. is hereby vacated and trial is rescheduled for May 20, 1991 at 10:00 a.m.