[No. G032727. Fourth Dist., Div. Three. May 9, 2005.]

FRANCIS McCANN, Plaintiff and Appellant, v.
LUCKY MONEY, INC., et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*The introductory paragraph, parts I, II, and III, and the dispositional paragraph at the end of part IV are ordered published in the Official Reports. Part IV is not to be published as it does not meet the standards for publication.

**1386**

## Counsel

White, Noon and Oliver, Daniel M. White, Timothy S. Noon; Franklin and Franklin and J. David Franklin for Plaintiff and Appellant.

Carroll, Burdick & McDonough, Tiffany Rystrom; Rogers & Harris, Michael Harris; Squire, Sanders & Dempsey, Juliana J. Keaton and Ben Chung for Defendants and Respondents.

## Opinion

**O'LEARY, J.**—This action was brought by Francis McCann, as a representative action on behalf of the general public, against Lucky Money, Inc., Servicio Uniteller, Inc., Vigo Remittance Corporations, and International Money Transmission Systems (hereafter referred to collectively and in the singular as Lucky Money). Lucky Money is involved in the business of exchanging customers' dollars into foreign currency for transmission to a foreign country. The rate of exchange Lucky Money gives its customers is generally less favorable than the rate of exchange at which Lucky Money obtains that foreign currency on the wholesale market. The gist of McCann's complaint is that Lucky Money commits an unlawful, unfair, and fraudulent business practice under the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.), engages in deceptive advertising under the false advertising law (FAL) (Bus. & Prof. Code, § 17500 et seq.), and violates the fiduciary duties imposed upon a trustee by Probate Code sections 16002 (duty of loyalty) and 16004 (conflict of interest), when it fails to disclose to the customer that it gets a more advantageous rate of exchange on the wholesale market than it gives the customer, and when it fails to give the customer the benefit of the better exchange rate. The trial court sustained Lucky Money's demurrer without leave to amend and the action was dismissed. We affirm the trial court's ruling.

I

STATUTORY CONTEXT

*The UCL*

■ The UCL prohibits "any unlawful, unfair or fraudulent business act or practice[.]" (Bus. & Prof. Code, § 17200.) "Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent. 'In other words, a practice is prohibited as "unfair" or "deceptive" even

if not "unlawful" and vice versa.' [Citation.]" (*Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632, 647 [58 Cal.Rptr.2d 89].) The remedies for violation of the UCL are equitable in nature, i.e., injunction and restitution. (Bus. & Prof. Code, § 17203.)

■  The scope of the UCL is broad and does not just proscribe specific business acts or practices. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*).) "[The UCL] defines 'unfair competition' to include 'any unlawful, unfair or fraudulent business act or practice.' (§ 17200.) Its coverage is 'sweeping, embracing " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' [Citations.] It governs 'anti-competitive business practices' as well as injuries to consumers, and has as a major purpose 'the preservation of fair business competition.' [Citations.] By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable. [Citations.] [¶] However, the law does more than just borrow. The statutory language referring to 'any unlawful, unfair *or* fraudulent' practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law. . . ." (*Cel-Tech, supra,* 20 Cal.4th at pp. 180–181, fn. omitted.)

■  But, the scope of the UCL is not unlimited. (*Cel-Tech, supra,* 20 Cal.4th at p. 182.) "Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare [business] conduct unfair. If the Legislature has permitted certain conduct . . . courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Ibid.*) "[W]here the allegedly unfair business practice has been authorized by the Legislature, no factual or equitable inquiry need be made, as the court can decide the matter entirely on the law." (*Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144, 1160 [93 Cal.Rptr.2d 439].) In any unfair competition case, *Cel-Tech* requires us to engage in a two-step process. First, we determine whether the Legislature has provided a "safe harbor" for the defendant's alleged conduct. If not, we determine whether that conduct is unfair. (*Cel-Tech, supra,* 20 Cal.4th at p. 187.)

*The FAL*

■  "California's false advertising law ([Bus. & Prof. Code,] § 17500 et seq.) makes it 'unlawful for any person, . . . corporation . . . , or any employee thereof with intent directly or indirectly to dispose of real or

personal property or to perform services . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . before the public in this state, . . . in any newspaper or other publication . . . or in any other manner or means whatever . . . any statement, concerning that real or personal property or those services . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading . . . .' ([Bus. & Prof. Code,] § 17500.)" (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 950 [119 Cal.Rptr.2d 296, 45 P.3d 243].) In short, Business and Professions Code section 17500 "prohibits advertising property or services with untrue or misleading statements or with the intent not to sell at the advertised price." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 52 [77 Cal.Rptr.2d 709, 960 P.2d 513].)

■ "[A] statement is false or misleading if members of the public are likely to be deceived. . . . 'The statute affords protection against the probability or likelihood as well as the actuality of deception or confusion.' " (*Chern v. Bank of America* (1976) 15 Cal.3d 866, 876 [127 Cal.Rptr. 110, 544 P.2d 1310] (*Chern*).) Hence, to establish a violation of the FAL for untrue and misleading advertising, "it is necessary only to show that 'members of the public are likely to be deceived.' " (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660].)

*The Money Transmission Law: Chapter 14 of the California Financial Code*

■ Division 1, chapter 14 of the Financial Code is entitled, "Transmission of Money Abroad." (Fin. Code, § 1800 et seq.) In enacting these laws, the Legislature declared, "It is the intent of the Legislature in enacting this chapter to protect the people of this state from being victimized by unscrupulous practices by persons receiving money for transmission to foreign countries and to establish a minimum level of fiscal responsibility and corporate integrity for all entities engaging in the business of receiving money for transmission to foreign countries without regard to the method of transmission." (Fin. Code, § 1800, subd. (a).) Accordingly, money transmitters (other than insured financial institutions) must be licensed by the Commissioner of Financial Institutions. (Fin. Code, §§ 112, 1800.3, subd. (a).)

■ Financial Code section 1810, subdivision (a), provides that a money transmitter must forward funds "received for transmission to a foreign country" within 10 days of receipt, unless the customer orders otherwise. Financial Code section 1810.5 provides that the money transmitter must refund a customer's money upon the customer's request if the funds are not forwarded in the requisite 10 days. (Fin. Code, § 1810.5, subd. (a).) The

money transmitter must give the customer a receipt for each transaction that clearly informs the customer of his or her right to a refund. (Fin. Code, § 1810.5, subd. (b).)

Financial Code section 1815, at the heart of this action, governs disclosures that must be given to a customer. Financial Code section 1815, subdivision (a), provides: "The receipt presented to each customer for each transaction pursuant to subdivision (b) of Section 1810.5 shall clearly state the rate of exchange for the particular transaction, the amount of commission or fees, and the net exchange after all fees and commissions have been deducted. The receipt shall also state the total amount of currency presented by the customer and the total amount to be delivered to the beneficiary designated by the customer. . . ." Similarly, Financial Code section 1815, subdivision (b), provides: "All window and exterior signs concerning the rates of exchange shall clearly state . . . the rate of exchange for exchanging the currency of the United States for foreign currency. All interior signs and all advertising, if rates are quoted, shall clearly state the rates of exchange for exchanging the currency of the United States for foreign currency and shall state all commissions and fees charged on all transactions."

Financial Code section 1816 provides, "All funds, less fees, received by a licensee or its agents for transmission to a foreign country shall constitute trust funds owned by and belonging to the person from whom they were received until such time as directions have been given by the licensee or its agents for payment abroad of the remittance and funds provided for such payment."

## II

## THE COMPLAINT

*The Original Complaint*

McCann's original complaint alleged Lucky Money was licensed to and was engaged "in the business of receiving money from members of the general public" for transmission to designated persons in foreign countries. "As a part of the money transfer transaction, [Lucky Money] . . . exchange[s] United States dollars into foreign currency."

In accordance with the Financial Code, Lucky Money gives each customer a receipt stating the rate of exchange for the particular transaction, the amount of commissions or fees being charged, and the net exchange after all fees and commissions have been deducted (e.g., how many units of foreign money the recipient will get). Lucky Money also posts the rate of exchange.

Because under the Financial Code Lucky Money has up to 10 days to transmit the money (in foreign currency) to the foreign recipient, it is able to pool its customers' monies to obtain a more favorable rate of exchange from the bank. Lucky Money realizes a profit from that more favorable rate.

Accordingly, McCann alleged, Lucky Money misleads its customers by telling them "a false rate of exchange" and by failing to disclose the true exchange rate. Additionally, the difference between the rate the customer is given and the rate Lucky Money gets from the bank constitutes an undisclosed commission or fee. Finally, McCann alleged that because customers' monies are trust funds, Lucky Money is a trustee and owes a fiduciary duty towards the customer to not profit from customers' funds. In other words, Lucky Money must give its customers the wholesale exchange rate it receives from the bank.

*The First Amended Complaint*

After Lucky Money's demurrer was sustained with leave to amend, McCann filed an amended complaint phrasing his allegations somewhat differently. He again alleged Lucky Money was "in the business of accepting money from members of the general public . . . and transmitting those funds to designated persons in foreign countries[,]" and was properly licensed. But, McCann now alleged, Lucky Money *does not* exchange dollars into foreign currency. Instead, after receiving customers' monies, Lucky Money takes those funds to "an institution [e.g., bank] authorized to exchange U.S. Dollars into foreign currency," where the actual currency exchange takes place. Upon obtaining a customer's money, Lucky Money gives the customer the receipt required by law (Fin. Code, § 1815) showing "a" rate of exchange, commissions and fees being charged, and "a" net exchange. But the receipt is "false," because it "purport[s] to disclose a rate of exchange which is not a rate of exchange at all; rather, it is a fictionalized number created by defendants which they falsely represent to be the actual rate of exchange received by defendants from an institution authorized to exchange U.S. Dollars into foreign currency."

McCann further alleged the customer receipt is also "false" because it does not accurately disclose the commissions and fees Lucky Money is getting. Specifically, Lucky Money pockets the difference between the higher "fictional" rate of exchange it tells the customer he or she is getting and the invariably lower "actual" rate of exchange Lucky Money actually gets from the bank. The receipt is also "false" because it does not show the customer's true "net exchange" since it is based on a "false/fictionalized" rate of exchange and does not account for the undisclosed "commissions/fees" being received by Lucky Money.

McCann alleged Lucky Money does "not set or otherwise designate the rate at which any particular customer's transmission monies will be exchanged into foreign currency." There is only a single exchange of money, based on a single rate of exchange, and that exchange takes place at the bank that actually transmits the money to the foreign country. Lucky Money misleads customers when, in advance of the actual money exchange that takes place at the bank, it tells them what the rate of exchange will be. McCann alleged Lucky Money simply holds its customer's money in trust for the customer to later exchange that money into foreign currency. By telling the customer a higher rate of exchange than the rate Lucky Money will subsequently get from the bank, Lucky Money is in essence misappropriating customers' monies it holds in trust.

McCann alleged: Lucky Money violated the UCL by failing to properly disclose to the customer the actual rate of exchange, the commissions it receives, and the customer's net exchange; Lucky Money violates the UCL by not giving the customer the same rate of exchange it gets from the bank; Lucky Money violated the UCL when it breaches its fiduciary duties owed to customers under the Probate Code; and Lucky Money violates the UCL and FAL by posting deceptive signs at its place of business stating a "false or fictionalized rate of exchange, rather than the actual rate of exchange obtained from the bank."

The trial court sustained Lucky Money's demurrer without leave to amend and dismissed the action. McCann appeals.

## III

## THE APPEAL

### 1. Standard of Review

We review an order sustaining a demurrer without leave to amend under well-established rules: " 'We treat the demurrer as admitting all material facts properly pleaded, *but not contentions, deductions or conclusions of fact or law.* [Citation.] We also consider matters which may be judicially noticed.' [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse

of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58], italics added.)

2. *Unlawful, Unfair or Fraudulent Business Practice: Financial Code Section 1815, Subdivision (a)*

Two of McCann's causes of action claimed violations of the UCL based on alleged violations of Financial Code section 1815, subdivision (a). The first cause of action alleged Lucky Money commits an *unlawful* business practice, violating Financial Code section 1815, subdivision (a), by not disclosing to its customers, and giving them the benefit of, the exchange rate at which Lucky Money purchases foreign currency. The second cause of action alleged Lucky Money commits an *unfair* business practice based on the same conduct.

We begin with some explanation as to the nature of the money transmission transactions that are the subject of this litigation. In short, a customer desiring to send United States dollars to a foreign country may purchase the foreign currency from a money transmitter at one exchange rate, i.e., retail rate. Money transmitters, like Lucky Money, typically purchase the foreign currency at a more favorable exchange rate, i.e., wholesale rate. The difference between the retail exchange rate and the wholesale exchange rate is typically referred to as the " 'FX [foreign exchange] spread,' " and needless to say the FX spread is often a source of additional profit to the money transmitter beyond the fees it charges the customer for the exchange. (See generally *In re Mexico Money Transfer Litigation* (N.D.Ill. 2000) 164 F.Supp.2d 1002, 1007.) At the time of the transaction, a customer must be given a receipt stating the exchange rate "for the particular transaction," commissions or fees being charged, the net exchange after commissions and fees have been deducted, the total amount of United States currency the customer has presented to the money transmitter, and the total amount of foreign currency to be delivered to the beneficiary in the foreign country. (Fin. Code, § 1815, subd. (a).) The receipt must also explain to the customer his or her refund rights. (Fin. Code, 1810.5, subd. (a).)

In his original complaint, McCann alleged customer transactions with Lucky Money essentially comporting with the above description, i.e., Lucky Money accepts dollars from a customer for transmission to a foreign country, it gives the customer one rate but buys foreign currency for a better rate, illegally (or improperly) profiting off the difference. In his amended complaint, McCann tried to change tacks by characterizing the transaction as involving only *one* "actual" foreign currency exchange transaction—the one in which Lucky Money buys foreign currency from a bank. McCann alleged

Lucky Money does not in fact "sell" foreign currency to its customer or "exchange" currency for the customer when the customer presents herself. Rather, Lucky Money merely acts as a fiduciary by taking customers' monies, which it then exchanges at an authorized financial institution on the customers' behalf. Thus, McCann alleges, the exchange rate Lucky Money quotes to the customer on the exchange receipt (and upon which all other information is based such as the net exchange and how much foreign currency the beneficiary in the foreign country will get) is a "fictionalized" or "false" exchange rate. Whereas, the exchange rate at which Lucky Money acquires the foreign currency from the bank is the "true" or "actual" exchange rate.

McCann has employed clever semantics (false/fictionalized rate instead of retail rate; true/actual rate instead of wholesale rate) to get around the nature of the transactions at issue. We are unimpressed. We look at the pleading in the context of the economic substance of the challenged transaction described therein, not the appellations McCann has chosen. No matter what the transactions are called, the economic substance is that customers buy foreign currency from Lucky Money at one rate, and Lucky Money buys the foreign currency elsewhere for a better rate. It is in that context that we consider whether the complaint alleges a violation of the Financial Code.

McCann admits Lucky Money gives its customers the legally required receipt at the time of the customer transaction. Nonetheless, McCann argues Lucky Money violates Financial Code section 1815, subdivision (a), because: (1) the customer receipt does not disclose the wholesale (e.g., "true" or "actual") rate of exchange, quoting the customer instead of the retail (e.g., "false" or "fictionalized") rate of exchange; (2) the customer receipt does not disclose the difference between the two rates (hereafter called the FX spread) or include it as a fee or commission; and (3) Lucky Money gives the customer a false "net exchange" because it bases the net on the retail exchange rate and does not give the customer the benefit of the wholesale rate—in other words, the customer does not get all the units of foreign currency to which he/she is entitled.

The allegations raised by McCann were the subject of two federal court opinions that emphatically rejected the same arguments in the context of approving the settlement of a class action lawsuit based on the same conduct by other licensed money transmitters: *In the Matter of: Mexico Money Transfer Litigation* (7th Cir. 2001) 267 F.3d 743, and *In re Mexico Money Transfer Litigation, supra,* 164 F.Supp.2d 1002.

The *Mexico Money Transfer Litigation* cases involved a class action lawsuit brought on a variety of legal theories challenging the defendant money transmitters' practices of failing to disclose to their customers the existence of the FX spread, and secretly profiting off the FX spread. A class settlement was reached. (*In re Mexico Money Transfer Litigation, supra,* 164 F.Supp.2d at p. 1006.) A group of California residents objected to the settlement arguing it was unfair to California residents who had much stronger claims under the California Financial Code. (*Id.* at p. 1022.)

The district court considered and rejected each of the objectors' arguments. First, the court considered whether the defendants' practices violated Financial Code section 1815, subdivision (a), i.e., whether the wholesale rate of exchange had to be disclosed and/or whether the FX spread had to be disclosed as a commission or fee, concluding no disclosure was necessary. "[T]he [Financial] Code draws a distinction between 'commission or fees' and the 'rate of exchange,' suggesting that the disclosure requirements with respect to the former will not apply to the latter. Further, while California banking officials have been aware for years that money transmitters purchase foreign currency at one rate but offer their customers a less favorable higher rate, . . . they have never interpreted the statute so as to require disclosures of the exchange rate spread to customers. . . . [¶] Notably, [Financial Code section] 1815 makes explicit requirements for disclosure of terms necessary for a customer to understand the financial aspects of a money transfer, including the rate of exchange, the service charge, and the number of pesos the recipient will recover. The rate at which the money transmitter itself purchases pesos is arguably not relevant to the customer and is not mentioned in [Financial Code section] 1815." (*In re Mexico Money Transfer Litigation, supra,* 164 F.Supp.2d at pp. 1023–1024.)

The district court then went on to consider the argument that money transmitters must "provide customers with pesos at the same rate of exchange that money transmitters themselves enjoy on the wholesale market. . . . [T]he California Legislature's failure to expressly prohibit the collection of revenue from FX spreads provides a powerful argument that the Legislature did not intend to do so. As noted earlier, Department officials have been aware of the practices of money transmitters for many years, but have never interpreted [Financial Code section] 1810[, subdivision] (a) as a prohibition against such practices. . . . [I]t would be impracticable for money transmitters to carry out their money exchange practices in the fashion that California Objectors urge is required. . . . Money transmitters purchase currency in bulk without regard to the specific date or rate for each retail transaction, in some instances

purchasing pesos after the retail transaction is already complete. Because the wholesale rate fluctuates frequently, it would not be possible to advise customers of the precise exchange rate at the time of the transaction, if that rate must be equal to the rate paid by the transmitter itself." (*In re Mexico Money Transfer Litigation, supra,* 164 F.Supp.2d at p. 1024.)

The district court also expressed serious doubt as to the objectors' argument that Financial Code section 1816's characterization of funds received for transmission as " 'trust funds,' " created a fiduciary duty claim. (See pt. 3, *post.*) "California law imposes no fiduciary obligations on commercial providers of goods or services. [(]*See McDermott v. Western Union Tel. Co.,* 746 F.Supp. 1016, 1023 (E.D.Cal. 1990).[)] Nor have Department officials interpreted [Financial Code section] 1816 as prohibiting money transmitters from collecting FX spread revenue. . . . [T]he Department instead has interpreted this language as authorizing Department officials to segregate funds received from customers in circumstances when the Department seizes the assets of a money transmitter, and protect those funds from the claims of general creditors." (*In re Mexico Money Transfer Litigation, supra,* 164 F.Supp.2d at pp. 1025–1026.)

Finally, in view of its conclusion the objectors had no private right of action for violation of the Financial Code, the district court also concluded the objectors had no cause of action under the UCL. "That legislation permits a private party to bring a claim for certain unfair, unlawful, or fraudulent business practices. To the extent that the Objectors argue that Defendants' practices are unlawful because they violate the California Financial Code, however, the court rejects this argument for the reasons set forth above. [¶] The Objectors' further argument that, even if not unlawful under the Financial Code, Defendants' practices are 'unfair,' is not persuasive. Defendants are engaged in business for a profit. Their failure to disclose their own costs or profit margins is not, on its face, unfair. The fact that California's comprehensive regulation of Defendants' practices does not label the challenged practices unfair is a further defense to any such claim: [¶] Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor. [(*Cel-Tech, supra,* 20 Cal.4th at p. 182)]."[1] (*In re Mexico Money Transfer Litigation, supra,* 164 F.Supp.2d at p. 1026.)

---

[1] McCann essentially concedes that if Lucky Money's practices are in compliance with the Financial Code, *Cel-Tech's* "safe harbor" precludes his UCL causes of action based on "unfair" conduct. Thus, he does little in his brief to separately justify his causes of action based

After the district court approved the settlement in the *In re Mexico Money Transfer Litigation*, the California objectors appealed. The Seventh Circuit affirmed, concluding the objectors had failed to demonstrate they would have fared better under California law. (*In re the Matter of: Mexico Money Transfer Litigation, supra,* 267 F.3d at p. 747.) The court of appeals concluded the claims had only nuisance value because, "No state or federal law requires either currency exchanges or wire-transfer firms to disclose the interbank rate at which they buy specie, as opposed to the retail rate at which they sell currency (and the retail price is invariably disclosed)." (*Id.* at p. 749.) The court of appeals then made the following cogent observation on the dispute: "Money is just a commodity in an international market. [Citation.] Pesos are for sale—at one price for those who buy in bulk (parcels of $5 million or more) and at another, higher price for those who buy at retail . . . . Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars. This is true in financial markets no less than markets for physical goods. The customer of a bank's foreign-exchange section (or an airport's currency kiosk) is quoted a retail rate, not a wholesale rate, and must turn to the newspapers or the Internet to determine how much the bank has marked up its Swiss Francs or Indian Rupees. The holder of a checking account may be promised a small interest rate (say, 2%) on the balance and is not told at what rate the bank lends these funds to its own customers. Nor need the bank, or an intermediary such as MoneyGram, explain to customers how it profits from the float on funds it holds for a day or two between receipt and delivery. MoneyGram and Western Union revealed . . . the exchange rate they offered (the price per peso) and the rate for the wire transfer to Mexico. Each customer was told how many dollars in the United States would result in how many pesos delivered in Mexico. Nothing in this transaction smacks of fraud, so the settlement cannot be attacked as too low." (*Ibid.*)

McCann argues we should not be influenced by the reasoning of the courts in the *Mexico Money Transfer Litigation* cases. First, he argues that because the courts were merely approving a class settlement, the issues were not truly litigated. We certainly agree that the *Mexico Money Transfer Litigation* cases are not *binding* on us. (See *Campbell v. Superior Court* (1996) 44 Cal.App.4th 1308, 1318 [52 Cal.Rptr.2d 385] [federal opinion not binding interpretation of state law].) Nor do the decisions have any collateral estoppel or res judicata effect. But that certainly does not stop us from relying upon the federal court opinions for their cogent reasoning and persuasive value.

on the "unfair" prong of the UCL. We note however, that we do not believe the cause of action can be maintained for the reasons articulated in the *Mexico Money Transfer Litigation* cases.

McCann argues the *Mexico Money Transfer Litigation* cases are factually distinguishable. The *Mexico Money Transfer Litigation* cases involved a "wholesale rate/retail rate" situation in which the money transmitter buys foreign currency for one rate and sells it to its customers for a higher rate, whereas McCann has alleged the rate at which Lucky Money buys foreign currency is the "true exchange rate" and the rate it quotes to its customers is a "false" or "fabricated" exchange rate. But as we have already noted above, regardless of the semantics employed, the economic substance of the transactions alleged by McCann and those involved in the *Mexico Money Transfer Litigation* cases are identical. Thus, we find the cases to be highly persuasive.

Finally, McCann suggests the *Mexico Money Transfer Litigation* cases got it wrong because they improperly relied upon timing as to when the customer must be given a receipt. Financial Code section 1815, subdivision (a), requires the customer be given a receipt "for each transaction" containing the requisite information including rate of exchange, commission or fees, net exchange, amount of currency presented by the customer, and total amount of foreign currency to be delivered to the beneficiary. Financial Code section 1810, allows the money transmitter 10 days to forward the foreign currency. McCann argues the *Mexico Money Transfer Litigation* cases wrongly assumed Financial Code section 1815, subdivision (a), requires the money transmitter to give the customer her receipt when the customer *gives* the money transmitter the United States dollars to be exchanged. McCann argues section 1815, subdivision (a), must be interpreted as requiring the money transmitter to give the customer the rate at which the money transmitter buys the foreign currency on the customer's behalf, and therefore the receipt should not be given to the customer until *after* the money transmitter has actually taken the customer's money to the bank, purchased the foreign currency, and transmitted it to the foreign beneficiary.

The absurdity of McCann's contention is obvious. Under his reasoning, a customer would turn over her United States dollars to a money transmitter, and she could not be told what rate of exchange she will get, or how much foreign currency will be received by the beneficiary, because the rate fluctuates. The money transmitter then has up to 10 days to take the customer's money to the bank, buy the foreign currency, and transmit it. The money transmitter would then have to track down the customer after the fact, and provide the receipt telling her what the rate of exchange was and how much foreign currency was transmitted. Under the scenario urged by McCann, the hapless customer gives up control over her money with no idea of what the exchange rate is going to be and cannot shop around for the best rate. Additionally, McCann's scenario renders the customer's right to a refund meaningless. The customer is not told of her right to a refund under Financial Code section 1810.5 until she gets the receipt, and if the receipt is not given until after the transfer of money has taken place, the customer no longer has a right to a refund.

■ In conclusion, we find the *Mexico Money Transfer Litigation* cases correctly assessed the transactions at issue and correctly assessed the requirements of Financial Code section 1815, subdivision (a). Lucky Money must disclose to its customer the rate of exchange at which Lucky Money is selling the foreign currency. It is not statutorily obligated to disclose the rate at which it purchases foreign currency or disclose its profit on the FX spread.

### 3. *No Fiduciary Relationship in Purely Commercial Transaction*

McCann's third and fourth causes of action are premised upon his assertion that Lucky Money is a fiduciary as to its customers. He asserts Lucky Money commits an unfair business practice under the UCL when it breaches its fiduciary duties by failing to disclose, and by profiting off of, the FX spread. He also contends Lucky Money is subject to the full panoply of fiduciary duties specified in the Probate Code, and it violates Probate Code sections 16002 (duty to administer trust solely for the beneficiaries' interest), and 16004 (trustee may not use trust property for trustee's own profit) when it profits off its customer's transmission funds by purchasing foreign currency at a better exchange rate than the rate given to the customer.

■ McCann's "trust" arguments are based on Financial Code section 1816, which provides funds received by the money transmitter from a customer "for transmission to a foreign country shall constitute trust funds owned by and belonging to the person from whom they were received until such time as directions have been given by the licensee or its agents for payment abroad of the remittance and funds provided for such payment."

■ We agree with McCann that under the plain language of Financial Code section 1816 a customer's transmission monies are trust funds. But we do not think that means what McCann thinks it means. Courts have aptly noted in the context of deeds of trust that, " 'Just as a panda is not a true bear, a trustee of a deed of trust is not a true trustee.' [Citation.]" (*Monterey S.P. Partnership v. W.L. Bangham, Inc.* (1989) 49 Cal.3d 454, 462 [261 Cal.Rptr. 587, 777 P.2d 623].) The same can be said here, for although the customer's transmission monies are trust funds, that does not make the money transmitter a true trustee.

■ Generally, there is no fiduciary owed duty in a purely commercial situation. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 221 [197 Cal.Rptr. 783, 673 P.2d 660].) In *McDermott v. Western Union Telegraph Co.* (E.D.Cal. 1990) 746 F.Supp. 1016, the court rejected the plaintiff's contention that a telegram company's failure to timely deliver a money order resulted in breach of a fiduciary duty because the nature of the relationship between the customer and the telegram

company was "in the nature of an arms-length transaction in which plaintiff bargained for defendant's promise to transmit a certain sum of money to her son." (*Id.* at p. 1023.) The district court in the *In re Mexico Money Transfer Litigation* case cited *McDermott* in support of its conclusion that it was unlikely a fiduciary claim could be based on the trust fund language of Financial Code section 1816. (*In re Mexico Money Transfer Litigation, supra,* 164 F.Supp.2d at pp. 1025–1026.)

The only common sense meaning that can be ascribed to the "trust fund" language of Financial Code section 1816 is that referred to in the *In re Mexico Money Transfer Litigation* case—the transmission funds are deemed trust funds so as to protect them from general creditors of the money transmitter. (*In re Mexico Money Transfer Litigation, supra,* 164 F.Supp.2d at pp. 1025–1026.) The language certainly does not create the kind of broad fiduciary duties McCann asserts.

The very case McCann relies upon, *Bank of America v. Bowden* (1956) 46 Cal.2d 863 [300 P.2d 10], supports our conclusion. That case concerned Financial Code section 12300.3, pertaining to check and money order sellers, which like Financial Code section 1816 provides that funds received by a licensed check seller from the sale of checks and money orders for the purpose of paying the customer's "bills, invoices, or accounts . . . constitute *trust funds owned by and belonging to the person from whom they were received . . . .*" The Supreme Court held that because the specific funds received by the check seller were "trust funds" they could not be reached by the check seller's the general creditors. (46 Cal.2d at p. 868.) Nothing in *Bank of America v. Bowden, supra,* 46 Cal.2d 863, suggests the check seller assumed broad fiduciary duties towards its customers by virtue of the "trust funds" language of the check seller law. Accordingly, we agree with the trial court in this case that McCann cannot state causes of action for breach of any fiduciary duty based upon Lucky Money's profiting off of the FX spread or failing to disclose the FX spread to its customers.

### 4. *False Advertising*

McCann's remaining two causes of action are premised on his assertion Lucky Money improperly advertises the rate of exchange and the commissions and fees being charged because it advertises the retail exchange rate, not the wholesale rate, and does not disclose the FX spread. He alleged the misleading advertising constitutes a fraudulent business practice under the UCL and false, misleading, and deceptive advertising under the FAL. Because we have concluded Lucky Money is not required to disclose the wholesale exchange rate or the FX spread, those causes of action fall as well.

IV

PROPOSITION 64[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed. Respondents are awarded their costs on appeal.

Sills, P. J., and Ikola, J., concurred.

A petition for a rehearing was denied June 6, 2005, and appellant's petition for review by the Supreme Court was denied September 21, 2005. George, C. J., did not participate therein.

[*]See footnote, *ante*, page 1382.