Filed 3/7/14  Vail Lake Rancho California v. Abreu CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VAIL LAKE RANCHO CALIFORNIA, LLC, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> KELLY ABREU et al., <br><br> Defendants and Respondents; <br><br> KID GLOVES, INC., <br><br> Defendant and Appellant. | D061892 <br><br><br> (Super. Ct. No. 37-2009-00094633-CU-FR-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Frederic L. Link, Judge.  Affirmed.

Phillips, Haskett & Ingwalson and Frederick C. Phillips for Plaintiff and Appellant.

Call & Jensen, Mark L. Eisenhut and Delavan J. Dickson for Defendant and Appellant and Defendants and Respondents.

Vail Lake Rancho California, LLC (VLRC) sued defendants, alleging "a scheme . . . to fraudulently place their real property assets . . . beyond the reach of their largest creditor, plaintiff [VLRC], by the creation of shell entities, by fraudulent conveyances and transactions,

and by the use of the non-judicial foreclosure process in a manner designed to defraud VLRC and render its claims uncollectible." Certain defendants moved in limine to exclude evidence of the underlying transfers because they occurred more than seven years prior to VLRC's lawsuit and, as such, were barred by the seven-year statute of repose set forth in California's Uniform Fraudulent Transfer Act (UFTA), Civil Code section 3439.09, subdivision (c).[1] The trial court granted the motion and ultimately entered judgment against VLRC on claims arising from those transfers.

VLRC contends the trial court erred in granting the motion in limine because VLRC's claims were not brought under the UFTA and, thus, were not subject to the UFTA's statute of repose. We disagree. The gravamen of VLRC's claims—whether styled as UFTA violations or otherwise—was that defendants fraudulently transferred their assets to shield them from VLRC. Accordingly, VLRC's claims were subject to, and untimely under, the UFTA's seven-year cutoff. (*Macedo v. Bosio* (2001) 86 Cal.App.4th 1044, 1050, fn. 4 (*Macedo*) ["the maximum elapsed time for a suit *under either the UFTA or otherwise* is seven years after the transfer"].)

VLRC further contends the trial court erred by entering a judgment that improperly allowed compounding of interest. We do not reach the merits of that issue, however, because VLRC forfeited the issue by failing to raise it with the trial court.

---

[1] This subdivision provides as follows: "Notwithstanding any other provision of law, a cause of action with respect to a fraudulent transfer or obligation is extinguished if no action is brought or levy made within seven years after the transfer was made or the obligation was incurred." (Civ. Code, § 3439.09, subd. (c).) All further statutory references are to the Civil Code unless otherwise indicated.

Defendant Kid Gloves, Inc. (Kid Gloves) appeals the denial of its motion for attorney fees. The court denied the motion because it found, under section 1717, subdivision (b)(1),[2] that there was no prevailing party. Kid Gloves contends the trial court erred because the motion was based on the express language of the trust deeds at issue, and not "on any sort of 'prevailing party' theory." We disagree. VLRC's claims were sufficiently related to the trust deeds that they were subject to a prevailing party determination under section 1717. Further, the cases Kid Gloves cites for the proposition that a court may award attorney fees notwithstanding the court's determination that there was no prevailing party simply do not stand for that proposition.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

During or before 1982, Gary Clawson (Clawson) and his former wife, Jean Clawson, jointly acquired 15 parcels of real property. They also executed a promissory note (Note 1) in the amount of $540,000 in favor of Federal Land Bank of Sacramento. Note 1 was secured by a trust deed (TD1) that encumbered 12 of the 15 parcels.

---

[2]    This subdivision provides as follows: "The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. *The court may also determine that there is no party prevailing on the contract for purposes of this section*." (§ 1717, subd. (b)(1), italics added.)

[3]    As we discuss in section I.A.1, *post*, the court's granting of the motion in limine was tantamount to granting a motion for judgment on the pleadings. Therefore, "we accept, for purposes of this appeal only, that all properly pleaded material facts alleged in the complaint are true," (*Kempton v. City of Los Angeles* (2008) 165 Cal.App.4th 1344, 1347), "but not contentions, deductions or conclusions of fact or law" (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126).

In 1989, Gary and Jean Clawson executed a promissory note (Note 2) in the amount of $243,296.91 in favor of United Mercantile Bank. Note 2 was secured by a trust deed (TD2) encumbering 14 of the 15 parcels.

Sometime before 1994, Clawson began operating a dude ranch on three of the 15 parcels. Clawson and his daughter, Kelly Abreu (together, the Clawsons), formed Sundance International, LLC (Sundance) to operate the ranch, which generated income by selling memberships. Clawson conveyed to Vail Custodial Holdings, LP (Custodial)—another entity controlled by the Clawsons—the three parcels on which Sundance operated the ranch. Custodial paid Clawson no consideration for the parcels. At some later time not specified in the record, Clawson conveyed another 10 of the 15 parcels to Sundance.

Beginning in March 1994, Sundance entered into a series of agreements with a neighboring property owner, KRDC, Inc. (KRDC). Under these "Vail Lake Agreements," KRDC transferred approximately 450 acres of land to Sundance and granted Sundance a number of rights and obligations regarding the use of a lake located on KRDC's property (Vail Lake) by Sundance's existing and prospective dude ranch members. In exchange, the agreements required Sundance to sell a certain number of memberships each year and to share 30 percent of those membership proceeds with KRDC. Sundance's obligations were secured by a payment and performance trust deed in favor of KRDC on the property sold to Sundance.

In 1995, KRDC sold its interests in Vail Lake and the Vail Lake Agreements to a third party, which, in turn, sold those interests to VLRC in 1998.

4

*Lawsuit 1*

In 1999, VLRC notified Sundance that it was in default under the Vail Lake Agreements. In February 2000, VLRC filed suit (Lawsuit 1) against Sundance, Clawson, and John Mulder[4] in Riverside County Superior Court seeking to judicially foreclose on the payment and performance trust deed. VLRC eventually obtained a judgment of approximately $17 million against Sundance, Clawson, and Mulder.

*Lawsuit 2*

Before the trial in Lawsuit 1 began, the Clawsons transferred nine of the 10 parcels previously transferred to Sundance to another of their controlled entities, Ecstatic Holdings, Inc. (Ecstatic). The Clawsons eventually transferred the remaining parcel to Ecstatic. In September 2006, VLRC filed suit (Lawsuit 2) against Ecstatic in Riverside County Superior Court seeking to set aside Sundance's conveyance of the 10 parcels to Ecstatic as a fraudulent conveyance. In 2009, Ecstatic stipulated that the transfers were fraudulent and conveyed the 10 parcels to VLRC by quitclaim deed.

*This Lawsuit*

Meanwhile, in April 2002, Sundance paid off Note 1.[5] But instead of having Note 1 canceled and TD1 reconveyed, Sundance and the Clawsons caused the instruments to be assigned to Kid Gloves, an entity owned and controlled by Abreu. Sundance paid off Note 2

---

4    VLRC alleges Mulder is a coconspirator of the Clawsons, but does not further explain their relationship. Mulder is not a party to this appeal.

5    Ownership of Note 1 and TD1 had changed hands a number of times over the years.

the following month.[6]  Again, instead of having Note 2 canceled and TD2 reconveyed, Sundance and the Clawsons caused the instruments to be assigned to Kid Gloves.

On March 23, 2009, Kid Gloves substituted a new trustee under TD1 and TD2.  The same day, the trustee recorded notices of default under TD1 and TD2 setting forth amounts due on Note 1 and Note 2 of approximately $5 million and $1 million, respectively.  On July 9, 2009, the trustee recorded a notice of sale under TD1 and TD2 setting July 30, 2009, as the date of sale.

VLRC, which (by virtue of the quitclaim deed from Ecstatic) then owned an interest in some of the parcels secured by TD1 and TD2, filed this lawsuit on July 24, 2009.  The complaint alleged "a scheme by members of the Clawson family . . . , acting individually and through their controlled companies . . . , to fraudulently place their real property assets . . . beyond the reach of their largest creditor, Plaintiff [VLRC], by the creation of shell entities, by fraudulent conveyances and transactions, and by the use of the non-judicial foreclosure process in a manner designed to defraud VLRC and render its claims uncollectible."  The complaint named Clawson, Abreu, Mulder, Custodial, Ecstatic, Kid Gloves, Sundance, and the trustee.[7]

VLRC obtained a preliminary injunction halting the foreclosure sale, and a series of demurrers and motions to strike followed.  One target of the demurrers was VLRC's sixth

---

[6]    Note 2 and TD2 had also changed hands several times over the years.

[7]    The court later entered defaults as to Clawson and Sundance.  The record includes a request for entry of default as to Mulder, but the request does not appear to have been entered as requested.  According to VLRC, Ecstatic was never served.  Thus, as is relevant to this appeal, the case proceeded only as to Abreu, Custodial, and Kid Gloves (together, the Defendants).

cause of action seeking damages for fraudulent conveyances. This cause of action alleged that the "conveyance to [Custodial], the conveyances to Ecstatic and the conveyances to Kid Gloves . . . were all fraudulent in that they were made without consideration and for the express purpose of defrauding the creditors of [Clawson] and [Sundance], and in particular VLRC." Abreu and Custodial demurred on the basis that the transactions VLRC complained of occurred beyond the seven-year period of repose provided in section 3439.09, subdivision (c). The trial court sustained the demurrer to the fraudulent conveyance claim without leave to amend.

Following additional demurrers and amendments, VLRC proceeded to trial on its second amended complaint (SAC), which asserted causes of action (1) "to Cancel notes and Trust Deeds," (2) for "Wrongful Foreclosure," and (3) "To Require Marshaling of Assets" (that is, requesting that the court specify the order in which Kid Gloves would be required to foreclose on parcels). The claim for cancellation of the notes and trust deeds alleged that Kid Gloves's acquisitions of the trust deeds and promissory notes in 2002 were fraudulent because the trust deeds "secure[d] notes that were paid in full," and because Kid Gloves paid no consideration and "was created for the express fraudulent purpose of having an entity in place to foreclose on the [property subject to the trust deeds] and prevent VLRC from levying against them to satisfy the Judgment in Lawsuit 1."

The cause of action for wrongful foreclosure was based on two theories. Like the first cause of action, one theory was premised on Kid Gloves's acquisition of the promissory notes and trust deeds. The second theory was premised on VLRC's allegation that Kid Gloves

7

fraudulently inflated the amounts due on the promissory notes when it initiated foreclosure proceedings in 2009.

Defendants filed a motion in limine requesting that the court "preclude[] Plaintiff from offering any evidence or argument that the 2002 conveyances of Note 1, Note 2, TD1, or TD2 to Kid Gloves, Inc. were somehow fraudulent." The motion was "made on the grounds that all facts giving rise to such issues would have occurred more than seven years prior to Plaintiff initiating this lawsuit, so, pursuant to California Civil Code Section 3439.09[, subdivision] (c), Plaintiff may not attempt to premise any claims on these allegedly fraudulent conveyances." Over VLRC's opposition, the court granted the motion, leaving VLRC with what it conceded was a "[v]ery stripped down case." As a result of the ruling, VLRC's wrongful foreclosure case was tried on the remaining theory that Defendants fraudulently inflated the amounts due on Note 1 and Note 2.[8]

At trial, the court received testimony and heard argument regarding which parcels were encumbered by which trust deeds, the balances due on the promissory notes, and whether the court should order marshaling. Kid Gloves sought to add to the balances due on the promissory notes the attorney fees it had incurred in defending VLRC's attempt to cancel the promissory notes and trust deeds. The court instructed the parties to address that issue by way of a postjudgment motion.

On February 28, 2012, the court entered judgment (1) in favor of Kid Gloves on VLRC's claim seeking cancellation of the promissory notes and trust deeds; (2) in favor of Abreu and Kid Gloves on the wrongful foreclosure claim; (3) declaring the amount owed on

---

[8]     VLRC subsequently clarified that it was not seeking damages in connection with this theory.

8

Note 1 to be $426,772.50 and on Note 2 to be $331,227.78, with interest accruing on both notes at 14 percent per annum; and (4) specifying the order in which Kid Gloves could foreclose on parcels securing Note 2.  The judgment stated that the court "ma[de] a finding that there is no prevailing party."

Kid Gloves then moved the court "for an order that adds the legal fees Kid Gloves was forced to incur to protect its status as owner of the promissory notes and trust deeds . . . to the amount outstanding on those notes."  Kid Gloves explained that its motion was based on the express language of TD1 and TD2,[9] and not "on any sort of 'prevailing party' theory."  The court denied the motion on the basis that it had "previously found that there was no prevailing party" under Civil Code section 1717, subdivision (b).

VLRC filed a notice of appeal from the judgment on April 25, 2012.  Kid Gloves filed a notice of appeal from the court's order denying attorney fees on June 12, 2012.

DISCUSSION

I. *VLRC'S APPEAL*

VLRC contends the trial court erred by granting the motion in limine excluding evidence of the 2002 assignments of TD1 and TD2 to Kid Gloves and by awarding compound

---

[9]    TD1 provides that the holder may "appear in and litigate any matters . . . affecting the security of lien, and may incur necessary costs, expenses, and attorney fees therefor" and that "money for payment of such costs, expenses, and attorney fees . . . together with interest accrued thereon shall be immediately due and payable" to the holder.

TD2 states, in "any action or proceeding" that would "materially affect" the holder's interest in TD2, the holder "may, but shall not be required to, take any action that [the holder] deems appropriate," and that "[a]ny amount that [the holder] expends in so doing will bear interest at the rate charged under the Note [secured by TD2] from the date incurred or paid by [the holder] to the date of repayment by Trustor."  TD2 further states that such expenses may "be added to the balance of the Note" and that TD2 "will secure payment of these amounts."

The parties do not dispute that the express language of TD1 and TD2 could authorize an award of attorney fees in appropriate circumstances.

9

interest on the judgment.  We disagree with respect to the motion in limine and conclude that VLRC has forfeited its argument regarding compound interest.

A.      *The Motion in Limine*

    1.      *Standard of Review*

"In limine motions are designed to facilitate the management of a case, generally by deciding difficult evidentiary issues in advance of trial."  (*Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1593.)  Motions in limine also can function as "an objection to any and all evidence on the grounds [the] pleadings [are] fatally defective" for failure "to state a cause of action."  (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 27.)  "When all evidence on a particular claim is excluded based on a motion in limine, the ruling is subject to independent review as though the trial court had granted a motion for judgment on the pleadings . . . ."  (*Dillingham-Ray Wilson v. City of Los Angeles* (2010) 182 Cal.App.4th 1396, 1402, 1403.)  Accordingly, we must "accept as true all material factual allegations of the challenged pleading, unless contrary to law or to facts of which a court may take judicial notice.  The sole issue is whether the complaint, as it stands, states a cause of action as a matter of law."  (*Edwards*, at p. 27.)

    2.      *Overview of the UFTA*

The thrust of VLRC's appeal is that the trial court erred in applying the UFTA's seven-year statute of repose to claims VLRC contends were not brought under the UFTA.  We therefore begin by briefly discussing the UFTA and its statutes of limitation and repose.

"The UFTA was enacted in 1986; it is the most recent in a line of statutes dating to the reign of Queen Elizabeth I."  (*Mejia v. Reed* (2003) 31 Cal.4th 657, 664.)  The statute was

10

"designed . . . for the protection of creditors." (*Lewis v. Superior Court* (1994) 30 Cal.App.4th 1850, 1873, italics omitted; accord, *Mejia*, at p. 668 ["The California Legislature has a general policy of protecting creditors from fraudulent transfers . . . ."].)

A fraudulent transfer under the UFTA involves " ' "a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim." ' [Citation.]" (*Filip v. Bucurenciu* (2005) 129 Cal.App.4th 825, 829.) The UFTA broadly and inclusively defines a " '[t]ransfer' " as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." (§ 3439.01, subd. (i).)

As is relevant to this appeal, the UFTA defines a fraudulent transfer as a "transfer made or obligation incurred by a debtor . . . , whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [¶] (1) [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." (§ 3439.04, subd. (a)(1); 2 Miller & Starr, Cal. Real Estate Digest, Fraudulent Conveyances and Transfers (3d ed. 2006) § 5, p. 98 [subdivision] (a)[(1)] . . . does not require proof of anything more than an actual intent to defraud"].)

Claims brought under the UFTA are governed by its statute of limitations and repose provisions.[10] A claim arising from an intentionally fraudulent transfer "is extinguished unless

---

[10]     "[W]hile a statute of limitations normally sets the time within which proceedings must be commenced once a cause of action accrues, the statue of repose limits the time within which an action may be brought and is not related to accrual. Indeed, 'the injury need not have occurred, much less have been discovered. Unlike an ordinary statute of limitations which begins running upon accrual of the claim, [the] period contained in a statute of repose begins

11

action is brought . . . [¶] (a) within four years after the transfer was made . . .or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." (§ 3439.09.) The UFTA "also includes a statute of repose . . . , which creates an absolute backstop of seven years within which a cause of action for fraudulent transfer must be filed." (*In re JMC Telecom LLC* (C.D.Cal. 2009) 416 B.R. 738, 742, citing § 3439.09, subd. (c).) That provision provides as follows: "Notwithstanding any other provision of law, a cause of action with respect to a fraudulent transfer or obligation is extinguished if no action is brought or levy made within seven years after the transfer was made or the obligation was incurred." (§ 3439.09, subd. (c).)

The UFTA supplements, rather than displaces existing law. (§ 3439.10 ["Unless displaced by the provisions of [the UFTA], the principles of law and equity . . . supplement [the UFTA's] provisions."].) Thus, "the UFTA is not the exclusive remedy by which fraudulent conveyances and transfers may be attacked. They may also be attacked by, as it were, a common law action." (*Macedo*, *supra*, 86 Cal.App.4th at p. 1051.) In those instances, "the applicable statute of limitations is [Code of Civil Procedure] section 338[, subdivision] (d), and, more importantly, the cause of action accrues not when the fraudulent transfer occurs but when the judgment against the debtor is secured (or maybe even later, depending upon the belated discovery issue)." (*Macedo*, at p. 1051.)

when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted.' [Citation.] A statute of repose thus is harsher than a statute of limitations in that it cuts off a right of action after a specified period of time, irrespective of accrual or even notice that a legal right has been invaded." (*Giest v. Sequoia Ventures, Inc.* (2000) 83 Cal.App.4th 300, 305.)

12

Critically, however, "*even if* belated discovery can be pleaded and proven . . . , in any event the maximum elapsed time for a suit *under either the UFTA or otherwise* is seven years after the transfer." (*Macedo*, *supra*, 86 Cal.App.4th at p. 1050, fn. 4; see also, e.g., *Donell v. Keppers* (S.D.Cal. 2011) 835 F.Supp.2d 871, 879 ["Plaintiff cannot attack a fraudulent transfer through an unjust enrichment claim without satisfying the requirements of [§] 3439.09[, subd.] (c)."].) That is because, "by its use of the term '[n]otwithstanding any other provision of law,' the Legislature clearly meant to provide an overarching, all-embracing maximum time period to attack a fraudulent transfer, no matter whether brought under the UFTA or otherwise." (*Macedo*, at p. 1050, fn. 4.) Although this language in *Macedo* is dicta, two federal courts sitting in California followed it as "well-considered dicta." (*Roach v. Lee* (C.D.Cal. 2005) 369 F.Supp.2d 1194, 1199 ["Even though this comment is dicta, federal courts sitting in diversity cases must generally follow both the holdings and well-considered dicta of state court decisions."]; *In re JMC Telecom LLC*, *supra*, 416 B.R. at p. 743.)[11] We, too, find *Macedo's* dicta well-considered because "it would be inordinate to bar [UFTA] fraudulent transfer claims after seven years while allowing common law fraudulent transfer claims to be brought 'scores of years after the transfer.' " (*Roach*, at p. 1199, quoting *Macedo*, at p. 1050, fn. 4.)

3.    *Analysis*

Under section 3439.09, subdivision (c), and *Macedo*, the dispositive issue is whether VLRC's causes of action to cancel the promissory notes and trust deeds and for wrongful foreclosure (as it relates to the 2002 transfers) were attempts to "attack a fraudulent transfer, *no*

---

11    Although federal court decisions interpreting state law are not binding on us, "that certainly does not stop us from relying upon the federal court opinions for their cogent reasoning and persuasive value." (*McCann v. Lucky Money, Inc.* (2005) 129 Cal.App.4th 1382, 1396.)

*matter whether brought under the UFTA or otherwise*."  (*Macedo*, *supra*, 86 Cal.App.4th at p. 1050, fn. 4, italics added.)  VLRC contends they were not, instead arguing they were really claims for conspiracy, alter ego, setoff, and cancellation of an instrument under section 3412 due to fraud.[12]  But the " 'gravamen of a complaint and the nature of the right sued upon, rather than the form of the action or relief demanded, determine which statute of limitations applies.' "  (*San Diego Unified School Dist. v. County of San Diego* (2009) 170 Cal.App.4th 288, 305; *Davies v. Krasna* (1975) 14 Cal.3d 502, 515 [" 'The statute of limitations to be applied is determined by the nature of the right sued upon, not by the form of the action or the relief demanded' "].)  We thus look to the gravamen of VLRC's claims, starting with VLRC's own words.

The very first paragraph of the SAC alleged "a scheme [by defendants] . . . *to fraudulently place their real property assets . . . beyond the reach of their largest creditor, Plaintiff [VLRC]*, by the creation of shell entities, *by fraudulent conveyances and transactions*, and by the use of the non-judicial foreclosure process in a manner designed to defraud VLRC

---

[12]    We note that "[c]onspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration."  (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511.)  Similarly, "[a] claim against a defendant, based on the alter ego theory, is not itself a claim for substantive relief, e.g., breach of contract or to set aside a fraudulent conveyance, but rather, procedural, i.e., to disregard the corporate entity as a distinct defendant and to hold the alter ego individuals liable on the obligations of the corporation where the corporate form is being used by the individuals to escape personal liability, sanction a fraud, or promote injustice."  (*Hennessey's Tavern, Inc. v. American Air Filter Co.* (1988) 204 Cal.App.3d 1351, 1359.)  We also observe that VLRC's assertion on appeal of an equitable offset does not appear to have been asserted in VLRC's pleadings or in argument to the trial court.

14

and render its claims uncollectible."[13]  (Italics added.)  VLRC alleged in the SAC's background facts that the "assignments and transfers of Note 1, TD1, Note 2, and TD2 were *fraudulent as to the creditors* of [Clawson] and [Sundance], *including VLRC*, in that the transfers . . . were made . . . for the purpose of *defrauding the creditors* of [Sundance] and [Clawson], and *in particular, VLRC*."[14]  (Italics added.)

In its first cause of action "to Cancel notes and Trust Deeds," VLRC alleged that "the assignments of TD1 and TD2 to [Kid Gloves] were made pursuant to a conspiracy . . . whereby the Subject Real Properties secured by said Trust Deeds could be *shielded from obligations* owed by [Sundance], [Clawson], and [Mulder] to Plaintiff.  *Said transfers were fraudulent . . . .*"  (Italics added.)  VLRC further alleged that Note 1 and Note 2 were assigned to Kid Gloves "pursuant to a conspiracy *to put the property* secured by TD1 and TD2 *beyond the reach of the creditors* of [Sundance] and [Clawson], and *particularly Plaintiffs*."  To punctuate its point, VLRC alleged that Kid Gloves "was created for the *express fraudulent purpose* of having an entity in place to foreclose on the Subject Real Properties and *prevent VLRC from levying against them to satisfy the Judgment in Lawsuit 1*."  (Italics added.)

In its second cause of action for wrongful foreclosure, VLRC alleged that the foreclosure proceedings "are wrongful and were conducted fraudulently and improperly in that Note 1 and Note 2, on which the foreclosures are based[,] were paid off by the obligor and/or [Sundance] in 2002 and thus should have been cancelled at that time."  In other words, the

---

13    VLRC's original complaint, which included a cause of action for fraudulent conveyances, began with an identical introduction.

14    VLRC's original complaint made a substantially similar allegation.

foreclosures were based on the loan documents that were fraudulently transferred to Kid Gloves in 2002.

Our reading of the SAC as a whole leads us to the unavoidable conclusion that—regardless of their labels—the gravamen of VLRC's claims is that the 2002 transfers of Note 1, Note 2, TD1, and TD2 to Kid Gloves were made with the "actual intent to hinder, delay, or defraud" VLRC.  (§ 3439.04, subd. (a)(1).)  Thus, VLRC's first and second causes of action relate to fraudulent transfers and are subject to section 3439.09, subdivision (c)'s "absolute backstop of seven years within which a cause of action for fraudulent transfer must be filed." (*In re JMC Telecom LLC*, *supra*, 416 B.R. at p. 742.)

VLRC cites *Wyatt v. Union Mortgage Co*. (1979) 24 Cal.3d 773 and *Schessler v. Keck* (1954) 125 Cal.App.2d 827 for the proposition that, as a result of VLRC's allegation of conspiracy, the statute of limitations on VLRC's claims did not begin to run until "the date of the last wrongful act," which VLRC contends occurred in 2009.  We are not persuaded. Neither of these cases involved a statute of repose, which "is harsher than a statute of limitations in that it cuts off a right of action after a specified period of time, irrespective of accrual or even notice that a legal right has been invaded."  (*Giest v. Sequoia Ventures, Inc.*, *supra*, 83 Cal.App.4th at p. 305.)

Because VLRC's claims arose from transfers that occurred more than seven years before VLRC filed suit, the trial court did not err in granting the motion in limine on the basis of section 3439.09, subdivision (c).

16

B.      *Compound Interest*

VLRC contends the trial court erred by entering a judgment that improperly allows for compound interest.  Defendants counter that VLRC "waived" this issue because, although VLRC objected to certain aspects of Kid Gloves's proposed judgment, VLRC never objected on the basis of the theory it now advances.[15]  VLRC did not address this argument in its reply brief.  We conclude VLRC has forfeited this issue.

"[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court."  (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293; *People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, 644-645 ["This specific argument was forfeited by appellant's failure to raise it in the trial court:  Although appellants were given the opportunity to challenge and seek modification of the language of the notice, and did so in many particulars, they raised no issue with this aspect of the notice."]; *City of San Marcos v. Coast Waste Management, Inc.* (1996) 47 Cal.App.4th 320, 328 ["By repeatedly failing to object to the language of the proposed written order, Coast effectively waived any objection to it"].)  "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected."  (*In re S.B.*, at p. 1293.)

The parties submitted competing proposed judgments to the trial court and briefed the merits of the competing versions.  VLRC objected to Defendants' proposed judgment on a number of grounds—such as the inclusion of amounts for property taxes and attorney fees—

---

15      "Although the loss of the right to challenge a ruling on appeal because of the failure to object in the trial court is often referred to as a 'waiver,' the correct legal term for the loss of a right based on failure to timely assert it is 'forfeiture,' because a person who fails to preserve a claim forfeits that claim.  In contrast, a waiver is the ' "intentional relinquishment or abandonment of a known right." ' [Citation.]"  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2.)

17

but not on the basis that it resulted in an improper compounding of interest. Nor does the record reflect that VLRC raised this issue with the trial court in any other manner. We therefore conclude VLRC has forfeited this issue.

C.     *Preliminary Injunction*

VLRC requests that if we reverse the judgment and order a retrial, that we also reinstate the preliminary injunction that the trial court initially issued but dissolved after trial. Because we are not reversing the judgment or ordering a retrial, we deny VLRC's request to reinstate the preliminary injunction.

## II.  *KID GLOVES'S APPEAL*

Kid Gloves appeals the order denying its request that the attorney fees it incurred defending against VLRC's cause of action to cancel the promissory notes and trust deeds be added to the balances on the promissory notes. Kid Gloves contends that because its "right to add attorneys' fees and costs to the amounts owing on the Promissory Notes has nothing to do with California Civil Code Section 1717," the trial court erred by denying the motion on the basis of its determination under section 1717, subdivision (b) that there was no prevailing party. In essence, Kid Gloves contends it is entitled to recover attorney fees regardless of whether it was declared the prevailing party. We disagree.

" ' "On review of an award of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law." '  [Citation.]" (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1213.)

18

The trial court's order denying Kid Gloves's motion addressed the prevailing party issue as follows: "The Court notes for the record that it previously found that there was no prevailing party. Pursuant to Civil Code [section] 1717[, subdivision] (b) there is no prevailing party; therefore, Attorney's Fees will not be awarded."

At the hearing on Kid Gloves's motion, the court gave the following rationale behind its finding that neither party prevailed: "Because [VLRC] lost on the [¶] . . . [¶] . . . fraudulent part of it. And [Kid Gloves] lost on those exorbitant fees that they were going after, so in my opinion it was a give give situation."

During trial, the court concluded that, as between the claim for cancellation of the loan documents and the claim for wrongful foreclosure arising from the inflated loan balances,[16] the latter was the impetus for the lawsuit:

> "The Court: And you admit that you put in inflated amounts which caused this, the plaintiff to come forward and stop this?
>
> "[Kid Gloves's counsel]: Well, again, on one of the notes, yes, it was an inflated amount, absolutely. On the other one it was not. But the -- again, we can go through the history of the case, but clearly the catalyst was to cancel the trust deeds. Sure --
>
> "The Court: It appears to be the catalyst of this case is that you folks overcharged, inflated your amounts. That is what the catalyst in this case is."

The court summed up its view on the prevailing party issue as follows:

> "You know, the contract is a contract is a contract. It goes by many names. But I think in this case, based upon what I have heard in this case,

---

16    VLRC correctly points out that Kid Gloves initially declared the aggregate sum due under the promissory notes to be approximately $6 million, whereas the trial court determined the correct amount to be approximately $758,000—roughly 13 percent of the amount sought by Kid Gloves.

based upon what I found in this case, there is no prevailing party. I feel that it would be a miscarriage of justice if I granted fees in this case. So I am going to rule under Civil Code section 1717[, subdivision] (b) that there is no prevailing party, therefore you are not entitled to fees."

Kid Gloves does not challenge the court's finding that there was no prevailing party. Instead, Kid Gloves argues that two cases—*Jones v. Union Bank of California* (2005) 127 Cal.App.4th 542 and *Caruso v. Great Western Savings* (1991) 229 Cal.App.3d 667—authorize an award of attorney fees in trust deed litigation wholly apart from section 1717 and without regard to who prevailed. Neither case supports this contention. To the contrary, *Jones* explicitly addressed the borrowers' contention that "the trial court abused its discretion in *determining that Bank is the prevailing party*." (*Jones*, at p. 549, italics added.) And in *Caruso*, the award of attorney fees was incident to a lender's postjudgment "memorandum of costs which included a request for attorney's fees." (*Caruso*, at p. 672.) Under Code of Civil Procedure section 1032, subdivision (b),[17] it is the *prevailing party* that is entitled to its costs. Thus, the appellate court's discussion in *Caruso* strongly implies that the trial court made a prevailing party determination in favor of the lender. Although Kid Gloves is technically correct when it observes that *Jones* and *Caruso* "never even mention[] Section 1717," a careful reading of those cases renders disingenuous Kid Gloves's insinuation that they authorize an award of attorney fees in favor of a party that was not declared the prevailing party.

Moreover, although the parties did not comprehensively brief the issue, it appears to us that VLRC's claim for cancellation of the promissory notes and trust deeds was one on a contract and, thus, governed by section 1717. " 'California courts construe the term "on a

17    Code of Civil Procedure section 1032, subdivision (b) provides: "Except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding."

20

contract" liberally.' [Citation.]" (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 240.) "The phrase 'action on a contract' includes not only a traditional action for damages for breach of a contract containing an attorney fees clause [citation], but also any other action that 'involves' a contract under which one of the parties would be entitled to recover attorney fees if it prevails in the action [citation]." (*Ibid.*) " 'In determining whether an action is "on the contract" under section 1717, the proper focus is not on the nature of the remedy, but on the basis of the cause of action.' [Citation.]" (*Id.* at pp. 240-241.) We thus turn to VLRC's causes of action.

VLRC's first cause of action was labeled a claim "to Cancel notes and Trust Deeds"—the very instruments under which Kid Gloves requested an award of attorney fees. VLRC alleged it was "entitled to judgment canceling TD1 and TD2, in that said Trust Deeds secure notes that were paid in full by the obligors on said notes . . . ." VLRC elaborated on this theory in its cause of action for wrongful foreclosure, where VLRC alleged that the foreclosure proceedings were "wrongful and were conducted fraudulently and improperly in that Note 1 and Note 2, on which the foreclosures are based were paid off by the obligor . . . and thus should have been cancelled at that time." We conclude these claims are sufficiently related to the promissory notes and trust deeds such that the claims are on the contract for purposes of section 1717. (See, e.g., *Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 347-348 [declaratory relief claim that "sought a declaration that the promissory note must be cancelled because it had been paid in full, and that the deed of trust must be reconveyed because the

21

foreclosure violated the terms of the deed of trust" was " ' "on the contract" ' " within the meaning of section 1717].)[18]

Kid Gloves argues that section 1717 "could not have any bearing on this matter given Kid Gloves is not seeking attorneys' fees *from VLRC*, and there is *no contract between Kid Gloves and VLRC* that could be the basis for an attorneys' fee award." (Italics added.) A similar argument was rejected in *Saucedo v. Mercury Savings & Loan Assn.* (1980) 111 Cal.App.3d 309 (*Saucedo*), where the court recognized that, "in every case in which the non-assuming grantee[19] has a sufficient interest in the property to warrant his resisting foreclosure, he would as a real and practical matter be required to pay reasonable attorney fees incurred by trustee and/or beneficiary should they prevail in the action to prevent foreclosure." (*Id*. at p. 315.) The court concluded "[t]his practical 'liability' of the nonassuming grantee is sufficient to call into play . . . section 1717." (*Ibid.*; see also *Wilhite v. Callihan* (1982) 135 Cal.App.3d 295, 302 ["Wilhite's 'practical liability' under the deed of trust provisions for litigation costs justified the trial court's invocation of section 1717."].) We thus reject Kid Gloves's assertion that section 1717 cannot apply by virtue of VLRC not being a signatory to TD1 or TD2.

---

18    We do not view this conclusion as inconsistent with our determination above that the gravamen of VLRC's claims for purposes of the UFTA statute of repose was a fraudulent transfer. The trust deeds subject to VLRC's claims were the contractual vehicles by which Defendants perpetrated their alleged fraudulent scheme.

19    The *Saucedo* court described the plaintiffs as "nonassuming grantee[s]" because they—like VLRC—acquired real property subject to a promissory note and deed of trust, but did not assume those loan documents. (*Saucedo*, *supra*, 111 Cal.App.3d at p. 310.)

Even if VLRC's claims were not on the contract under section 1717, we still see no error. (E.g., *California Aviation, Inc. v. Leeds* (1991) 233 Cal.App.3d 724, 731 ["[T]he trial court's stated reasons for its ruling do not bind us. We review the ruling, not its rationale."].) Taken to its extreme, Kid Gloves's argument would lead to the absurd result of allowing even a *losing party* to recover attorney fees in trust deed litigation. Kid Gloves cites no authority that condones such a result. To the contrary, the procedures by which parties typically recover contractually authorized attorney fees require a finding that the party seeking fees is the prevailing party. (See, e.g., Civ. Code, § 1717, subd. (a) ["[T]he party who is determined to be the party prevailing on the contract . . . shall be entitled to reasonable attorney's fees . . . ."]; Code Civ. Proc., § 1032, subd. (b) ["prevailing party is entitled as a matter of right to recover costs in any action or proceeding"].)[20] Those authorities also empower trial courts to determine that there is no prevailing party entitled to attorney fees. (Civ. Code, § 1717, subd. (b)(1) ["The court may also determine that there is no party prevailing on the contract. . . ."]; Code Civ. Proc., § 1032, subd. (a)(4) ["When any party recovers other than monetary relief . . . the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not . . . ."].)

Because Kid Gloves has cited no authority that persuades us to deviate from the general rule that only a prevailing party may recover contractually authorized attorney fees, we conclude the court did not err in denying Kid Gloves's motion for attorney fees.

---

20      Those costs may include attorney fees when authorized by contract. (Code Civ. Proc., § 1033.5, subd. (a)(10)(A).)

## DISPOSITION

The judgment and the order denying attorney fees are affirmed.  All parties are to bear their own costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.